# UNITED STATES DISTRICT COURT

## DISTRICT OF CONNECTICUT

FILED

2010 JAN 27  A 10: 11

U.S. DISTRICT COURT
~PORT, CON~

In the matter between:

Dorotheos K. Mafidis

Tatiana Foteini D. Mafidi

1B Pasifais Str.

Vari (Lithouriza)

166 72 Attiki Greece

**3 10 CV 119 CSH**

**Vs.**

**January 4ᵗʰ, 2010**

Subway International B.V

Doctor's Associate Inc.

325 Bic Drive,

Milford, CT 06461 U.S.A

## MOTION TO VACATE
## A DEFAULT AWARD OF ARBITRATOR

Subway International BV, filed a Demand for Arbitration on November 4ᵗʰ, 2008 against Dorotheos K. Mafidis and Tatiani Foteini D. Mafidis, joint and severally referred as the "Movants" **(SEE EXHIBITS A, B and C),** before the American Dispute Resolution Center, Inc. under UNCITRAL Arbitration Rules in New Britain, Connecticut, seeking relief for the following:

1

1) Termination of the Franchise Agreement due to breach of the Franchise Agreement between both parties dated January 19,2007 **(SEE EXHIBIT D)**.

2) Royalties fees for the amount of 11.033,22 Euros

3) Advertising fees for the amount of 4.846,11 Euros,

3) An order from the Arbitrator that the Movants must immediately cease selling sandwiches from the former SUBWAY location, and

4) Damages in the amount of 10,000 USD, plus eight (8%) percent of gross sales during the period of one (1) year.

**On February 6th, 2009 an Award of Arbitrator was issued (SEE EXHIBIT E) by default of the Movants**, in accordance with the arbitration agreement and the oral hearings having been waived, where the Arbitrator found and awarded the Claimant (Subway International BV), as follows:

a.   The Franchise Agreement executed between the Claimant and Respondent (referred hereby as the Movants) dated January 19, 2007 (the "Agreement") has been breached by the Respondent.

b.   The Agreement and the Respondent's rights to operate thereunder are terminated as of February 6, 2009.

c.   Claimant is awarded the sum of 21.012,61 Euros representing royalties in the amount of 14.642,13 Euros, advertising fees in the amount of 6.370,48 Euros and related charges owed to Claimant by Respondent in accordance with the Agreement.

d.   The Respondent must disidentify the SUBWAY store and cease and desist use of all trade names, trademarks, service marks, signs, colors, structures, printed goods and forms of advertising indicative of the Claimant's sandwich business and return the Operations Manual to the Claimant aw required by Paragraph 8e of the Agreement. Without prejudice to any of Claimant's other possible rights, in accordance with the terms of the Agreement, if Respondent fails to comply with these requirements, Respondent shall pay Claimant the sum of Two Hundred and Fifty Dollars and No Cents ($250.00 USD) per calendar day that the non-compliance persists from February 6, 2009 forward.

e.  The Respondent must comply with the following conditions contained in paragraph 8g of the Agreement : the Respondent shall not directly engage in or insist another to engage in, any sandwich business other than a duly licensed SUBWAY restaurant on the premises in which their franchise operated for a period of one year from February 6, 2009. If Respondent fails to comply with these requirements, Respondents shall pay Claimant the sum of Ten Thousand Dollars and No cents ($10.000 USD) for each sandwich business they are associated with plus eight percent (8%) of the gross sales of each business during the one (1) year period.

f.  This Award is in full settlement of all claims and counterclaims submitted to this Arbitration. All claims not expressly granted herein are hereby denied.

The above Award of Arbitrator was never served to the Respondents (Movants) neither did the Movants acknowledge its existence due to bad faith of the Claimant **(SEE EXHIBIT F and G)**.

_In reference to the above, the default Award of Arbitrator should be set aside due to "good cause" for the following reasons:_

**1)** The above referred documents of the case were not served correctly. The Claimant in the case (Subway International BV) sent (shipped) all documents concerning the dispute and the hearing via registered mail (Fedex) to the Movants on February the 4th, 2009 and were received by signature on the 10th of February, 2009, meaning the Movants received all documents of the case **four (4) days** after the hearing took place (February 4th, 2009) and the Award of Arbitrator had already been issued (February 6th, 2009) **(SEE EXHIBIT H and I)**.

The Movants never knew when the hearing took place and what the result was until they hired an Attorney on October 19th, 2009 **(SEE EXHIBIT G)**. This obviously explains why the Claimant had the ability to enter judgment so quickly and in the absence of the Movants and why the Movants were unable to exercise their legal rights on time.

**2)** The Award of Arbitrator in default should be set aside attributable to non-performance because of force majeure (contingency). During the period from December 2008 to January 2009 the whole center of the city of Athens (capital of Greece), also location of the former Subway store owned by the Movants, was in flames caused by terrorists activity. These acts of terrorism where shown and acknowledged worldwide, even the Claimant had sent e-mails to other franchisees expressing its concern and grief for all stores that had been burned or destroyed.

**3)** The Award of Arbitrator in default should be set aside due to non-performance because of economic failure. The Movants faced enormous economic problems that occurred due to Claimants lack of support as obligated by the Agreement and breach of contract on its behalf. It is a fact that the Movants were evicted from the premises by the landlords since they could not continue to pay rent and Tatiani Foteini Mafidis at only the age of twenty-four (24) lost her business creditability for a period of seven (7) years under the condition she pays off all her creditors in that period of time. If not, she will have no creditability for a period of fourteen (14) years according to Greek Law.

**4)** The Award of Arbitrator in default should be set aside considering that in relation to paragraph 10c of the Franchise Agreement signed on January 19th, 2007 by both parties **(SEE EXHIBIT D)**, *.The parties agreed to arbitrate any Dispute the parties do not settle under the discussion procedures, and any Dispute which the Agreement provides will be submitted directly to arbitration, except as provided in the Agreement. The arbitration will be held in accordance with the United Nations Commission on International Trade Regulations and Law (UNCITRAL) Arbitration Rules administered by an arbitration agency, such **as the International Centre for Dispute Resolution, an affiliate of the American Arbitration Association, at a hearing to be held in New York, New York, USA..**

The Claimant erroneously filed a Demand for Arbitration before the American Dispute Resolution Center located in New Britain, Connecticut instead of filing its Demand before the International Centre for Dispute Resolution, located in New York, New York USA, as agreed by the Agreement, considering the fact that the dispute was an International case and not local.

4

Therefore, the Award of Arbitrator should be set aside due to lack of local competence.


Therefore, Movants ask that the Court set aside the default Award of Arbitrator dated February 6th, 2009 due to "good cause" for their failure to respond to the Claimant's Demand for Arbitration and appear at the scheduled hearing in reference to all the above true facts and reasons.


Signed on January 4th, 2010.

Signature of Movants,

Dorotheos K. Mafidis

Tatiana Foteini D. Mafidi

5

## Certification of Service

I hereby notify that a true and correct copy of the forgoing has been served through registered mail (DHL) to Tricia Lee, Attorney, on behalf of Subway International BV on this 4th day of January, 2010.

Dorotheos K. Mafidis

Tatiana Foteini D. Mafidi

EXHIBIT "A"



SUBWAY INTERNATIONAL B.V. • Prinsengracht 13 *
1015 DK • Amsterdam • The Netherlands
Telephone: +31-20-531-7300
Fax: +31-20-531-7301

---

November 4, 2008
VIA Fed-Ex 9770 7106 9089

Dorotheos K. Mafidis
Tatiani Foteini D. Mafidi
SUBWAY® 41704
Syghrou 22 Kaleshroy 1
Athens, GRE   10563

RE: NOTICE OF ARBITRATION: SIBV V: Dorotheos K. Mafidis and Tatiani Foteini D. Mafidi
Subway® Store #41704 – Syghrou 22 Kaleshroy 1   Athens, GRE   10563

Dear Dorotheos Mafidis and Tatiani Foteini Mafidi;

Enclosed please find a Demand for Arbitration for your Franchise Agreement dated January 19, 2007.
This has been sent to the American Dispute Resolution Center on November 4, 2008.

If you have any questions please contact your Collection Representative, Dylan Nicholson,  at 3120-
531-7300 extension 5377.

Sincerely,

Tricia Lee
Attorney
Legal Department

TL/pf
Enclosures

cc : Bletas/Bletas(Development Agent's)via E-Mail
cc:  ADRC via Fedex #9770 7106 9104

Subway International (SIBV), a Netherlands limited liability corporation, acts as a franchisor for the
SUBWAY® sandwich shops in Greece.   SIBV has a service contract with Doctor's Associates Inc., which is
also the trademark holder of the word SUBWAY® in Greece and in other international venues.   As part of the
service contracting arrangement, Doctor's Associates Inc. provides certain service, including legal services on
behalf of SIBV.

---

All correspondence should be directed to:
Doctors Associates Inc.   Collection Department

# American Dispute Resolution Center, Inc.
Demand for Arbitration Form

**UNCITRAL RULES**

Date:  November 4, 2008

**Respondent**: Name:  Dorotheos K. Mafidis and Tatiani Foteini D. Mafidi

Type of Business or Occupation:  **Subway® Store #41704**

Address                                   Syghrou 22 Kaleshroy 1

City, State & Zip Code          Athens,  GRE 10563

Telephone:  011 306 974 581 220

Name of Attorney or Representative _____

 Name of Firm or Company _____

 Address _____

 City, State & Zip Code _____

 Telephone (    )_____ Fax (    )_____

------------------------------------------------------------------------

**Claimant**:  Name                       **SUBWAY INTERNATIONAL  B.V.**

 Type of Business or Occupation:  **Franchisor of Sandwich Shop**

 Address                                  **325 Bic Drive**

 City, State & Zip Code          **Milford, CT  06460**

 Telephone **(203)- 877-4281**              Fax **(203)-876-6678**

Name of Attorney or Representative :  **Tricia Lee**

 Name of Firm or Company :  **DOCTOR'S ASSOCIATES INC.**

 Address                                  **325 Bic Drive**

 City, State or Company          **Milford, CT  06460**

 Telephone (203)  877-4281              Fax (203)  876-6678

Claimant, is a party to a written contract containing an arbitration agreement, dated January 19, 2007, which, provides for arbitration under the rules of **American Dispute Resolution Center, Inc.**, is demanding arbitration as stated below. **SEE SCHEDULE "A" (par. 10.c.)**

Nature of the Dispute: **(SEE ATTACHED)**

Amount of Claim or Relief Sought: **(SEE ATTACHED)**

Location of Hearing:          **New York, New York USA**

Signed:_____ Title: **Attorney**(Claimant)
                 Tricia Lee

In order to initiate the arbitration, Claimant must submit a copy of the contact and two copies of the demand with the proper filing fee, which is listed in the rules, to the ADRC.  Send the original demand form to the Respondent.

Agreed Upon Rules of Procedure:          ☐ ADRC          ☐ Other: _____

If the Claimant is interested in submitting this matter to mediation, please indicate by marking a check here ☐.  The ADRC will

EXHIBIT C

**NATURE OF DISPUTE**

**FRANCHISE STORE #41704**

**DOROTHEOS K. MAFIDIS AND TATIANI FOTEINI D. MAFIDI**

**THE FRANCHISEES HAVE BREACHED THEIR FRANCHISE AGREEMENT.**

**THE CLAIM OR RELIEF SOUGHT IS OVER $10,000.00**

**TERMINATION OF THE FRANCHISE AGREEMENT IS SOUGHT.**

4

**CLAIM OR RELIEF SOUGHT**
**SUBWAY® STORE #41704**
**DOROTHEOS K. MAFIDIS AND TATIANI FOTEINI D. MAFIDI**

1. The amount claimed is over $10,000.00.

2. A Declaratory Award that the Respondents have breached the Franchise Agreement executed with Claimant dated January 19, 2007.

3. In the event the Respondents have breached their aforementioned Franchise Agreement, termination of the Respondents Franchise Agreement.

4. If it is found that the Respondents have breached their aforementioned Franchise Agreement, an Award that the Respondents should discontinue use of trade names, trademarks, service marks and other related items indicative of a relationship with the Claimant.

5. If it is found that the Respondents have breached their aforementioned Franchise Agreement, then for one year after termination, expiration or transfer of this Agreement the Respondents will not directly or indirectly engage in, or assist another to engage in, any sandwich business (other than another duly licensed SUBWAY® restaurant) on the premises which their franchise operated. The Respondents agree to pay the Claimant $10,000.00 US for each sandwich business they are associated with that is located on the premises which their franchise was operated in violation of this Subparagraph, plus eight percent (8%) of the gross sales of such business during the one (1) year period, as being a reasonable pre estimate of the damages the Claimant will suffer. The Claimant may also seek to enjoin the Respondents' activities under Subparagraph 10 e. (European Union Rider, Section IV, paragraph 8 g.).

6. An Award of all Monies owed to Claimant by the Respondents in accordance with the terms and conditions of the aforementioned Franchise Agreement and continuing to accrue to an amount to be shown during the course of the arbitration proceeding.

7. If the Respondents do not cease and desist use of all trade names, trademarks, service marks and other related items, the Respondents agree to pay $250.00 US a day for each day they are in default in accordance with paragraph 8.e. of the Agreement.

8. If it is found that the Respondents have withheld monies due under the aforementioned Franchise Agreement an Award that the Respondents shall reimburse Claimant for all reasonable costs incurred in pursuing the collection of all withheld monies, including all Arbitration fees, Arbitrator's compensation and Hearing costs.

c. Your rights under this Agreement may pass to your next of kin or legatee upon your death. Each such transferee must deliver a written assumption to us, agree in writing to attend our next training session and may also be required to achieve a passing score on the standardized test (if not already a SUBWAY® franchisee). Each transferee must then successfully complete our training program or will be in default under this Agreement. The transferees will also assume the Sublease in writing.

d. We may transfer and assign this Agreement without your consent, and this Agreement will inure to the benefit of our successors and assigns. You consent that any of our Affiliates or their designees may succeed to our interests or the interests of our designee in the Sublease or the lease under the Assignable Interest.

**10. DISPUTE RESOLUTION.** The parties want to settle all issues quickly, amicably, and in the most cost effective fashion. To accomplish these goals, the parties agree to the following provisions that will apply to resolve any dispute or claim arising out of or relating to this Agreement, or any other Franchise Agreement the parties have with each other (a "Dispute"):

a. The parties agree to first notify each other in writing of any Dispute. The written notification will specify, to the fullest extent possible, the notifying party's version of facts and all elements of the Dispute. You agree to use your best efforts to communicate with us, including the Ombudsmen Department, and the recognized franchisee owners representative organization, to attempt to resolve the Dispute. If the parties do not resolve the Dispute within thirty (30) days after receipt of the notice of the Dispute, we or you may commence arbitration as provided in this Paragraph 10. Each party will be responsible for its own costs, including lawyers' fees, in any arbitration or court proceeding, except as otherwise provided in this Paragraph 10.

b. The parties agree that except as otherwise provided in this Agreement, the arbitration procedures will apply to all Disputes, including the breach of this Agreement and any alleged precontractual representations or conduct, applicable national and local franchise disclosure or franchise relationship laws, unfair trade practice laws, or similar laws.

c. The parties will arbitrate any Dispute the parties do not settle under the discussion procedures above, and any Dispute which this Agreement provides will be submitted directly to arbitration, except as provided in this Agreement. The arbitration will be held in accordance with the United Nations Commission on International Trade Regulations and Law (UNCITRAL) Arbitration Rules administered by an arbitration agency, such as the International Centre for Dispute Resolution, an affiliate of the American Arbitration Association, at a hearing to be held in New York, New York, USA. The arbitration will be conducted in English and decided by a single arbitrator unless the law of the country where the Restaurant is located requires three (3) arbitrators. Any court having jurisdiction may enter judgment on the arbitrator's award. Except as provided in this Agreement, a party must commence and pursue arbitration to resolve Disputes before commencing legal action. We will honor validly served subpoenas, warrants and court orders.

d. If a court of competent jurisdiction decides the requirement to arbitrate a Dispute is unenforceable because applicable law does not permit the type of claim involved to be resolved by arbitration, or because this Agreement limits a party's rights or remedies in a manner applicable law does not permit, or for any other reasons, then under Subparagraph 11.c., the entire arbitration clause is not void. Only the portions of the arbitration clause with respect to such claim or claims as are necessary to comply with applicable law will be invalid and considered severable, but the remainder will be enforced.

e. You recognize if you breach the provisions of this Agreement that prohibit you from infringing intellectual property rights in the Marks or in copyrighted items, or from disclosing Confidential Information, or from competing, you may cause irreparable harm to us, our Affiliates, other franchisees, and the System as a whole. We or an Affiliate may bring an action in any court having jurisdiction, in accordance with the laws of that jurisdiction, in connection with any such breach, and may seek damages, injunctive relief, or both. Notwithstanding any other provision of this Agreement, if a breach specified in this Subparagraph 10.e. occurs, both parties agree that due to the likelihood of such breach causing immediate and irreparable harm we do not have to provide you with written notice of such breach before seeking any damages, injunctive relief or both and that this Agreement may be terminated by us immediately. Notwithstanding any other provision of this Agreement, the arbitration procedures above, and the monetary limitation on damages in Paragraph 18 below, will not apply to any such breach.

f. You agree the only person or entity from which you may seek damages or any remedy for any Dispute, including the breach of this Agreement, is us, or our successor or assign. You agree you will not name our shareholders, directors, officers, employees, or agents, or Licensor, DAI, our other Affiliates, or the Development Agent, or the shareholders, directors, officers, employees, agents, or partners of Licensor, DAI, our other Affiliates, or the Development Agent, in any arbitration or legal action. You agree none of these other entities or individuals will be liable to you; only we will. You acknowledge we have relied on this representation in signing this Agreement.

g.  Notwithstanding any other provision in this Agreement, we may send default notices to you and terminate this Agreement without first giving notice of a Dispute or pursuing arbitration.  You may dispute the termination by filing a demand for arbitration within thirty (30) days after the effective date of the termination, without first giving notice of a Dispute.  You may only demand a Declaratory Judgment in the arbitration to determine if the termination was invalid and only request an award reinstating this Agreement.  The arbitrator may only rule on the validity of the termination and the award may only grant or deny the request for reinstatement.  You will waive the remedy of reinstatement if you do not file for arbitration within the time allowed.  We may file a demand for arbitration requesting validation of the termination of this Agreement and appropriate relief and may seek court confirmation of any arbitration award without first giving notice of a Dispute.

h.  If a party: (i) commences action in any court, except to compel arbitration, or except as specifically permitted under this Agreement, prior to an arbitrator's final decision, or (ii) commences any arbitration or litigation in any forum except where permitted under this Paragraph 10, then that party is in default of this Agreement.  The defaulting party must commence arbitration (or litigation, if permitted under this Paragraph 10), in a permitted forum prior to any award or final judgment.  The defaulting party will be responsible for all expenses incurred by the other party, including lawyers' fees.  If a party defaults under any other provision of this Paragraph 10, or under any provision of Paragraph 18, including, but not limited to, making a claim for special, incidental, consequential, punitive, or multiple damages, or damages in excess of the amount permitted under this Agreement, or you name a person or entity in any arbitration, or legal proceeding other than us, the defaulting party must correct its claim.  The defaulting party will be responsible for all expenses incurred by the other party, or the improperly named persons or entities, including lawyers' fees, and will be liable for abuse of process.

i.  Any settlement or arbitration award will have a binding effect only on the actual Dispute arbitrated, and will not have any collateral effect on any other Dispute whatsoever, whether in litigation, arbitration, or other dispute resolution proceeding.  You will arbitrate or litigate each Dispute with us on an individual basis.  You will not consolidate your Dispute in any arbitration or litigation action, with a claim by any other franchisee, individual, or entity.

j.  If a court of competent jurisdiction decides the arbitration clause in Subparagraph 10.c. is unenforceable, and after any and all final appeals the decision is upheld, the parties agree to litigate a Dispute in the United States District Court for the District of Connecticut, USA.  In the event that the arbitration clause is held unenforceable and the parties are subject to litigation in a local court of competent jurisdiction, local law shall apply.  The parties waive any right to trial by jury, except where waiver is prohibited by applicable law.

k.  The parties submit to the jurisdiction of any tribunal or court in accordance with Subparagraph 10.c. and Subparagraph 10.j., for arbitration or litigation of any Dispute, and waive any right to object to the location being inconvenient.  Such jurisdiction will be exclusive, except for our right or our Affiliates' rights under Subparagraph 10.e. to bring an action in any court having jurisdiction, to protect intellectual property rights in the Marks, copyrighted items, and Confidential Information, or to enforce the covenants not to compete.

l.  We or you must start the action permitted under this Paragraph 10 to resolve a Dispute, whether by giving notice of the Dispute or filing for arbitration, litigation, or any other permitted proceeding, within one (1) year from the time the events occurred which give rise to the Dispute, or the claim will be barred, except we may bring a claim under Subparagraph 5.h. for under-reported sales within five (5) years from the under-reporting or the maximum time period allowed by law for up to five (5) years.  We or you may bring an action for indemnification within one (1) year after we or you have notice of the claim that gives rise to the indemnification action.  The parties recognize this Subparagraph may have shorter time limits than applicable law will permit.

m.  Our waiver of any of your defaults will not constitute a waiver of any other default and will not prevent us from requiring you to strictly comply with this Agreement.

n.  The sublessor, whether us or our designee, may evict you from the Restaurant if you breach the Sublease.  If local law allows, we or our designee may evict you if you breach a direct lease with the landlord if we or our designee exercise the rights under the Assignable Interest of lease.  The provisions of this Paragraph 10, regarding Disputes, do not apply to our actions or our designee's actions to enforce the terms of the Sublease or the lease under this Agreement, and we or our designee do not have to give notice of the dispute or claim or file an arbitration to enforce rights under the Sublease.

o.  We and our Affiliates, and you and your Affiliates, will not withhold any money due to the other party and its Affiliates, under this Agreement or any other agreement.  A party or its Affiliate that withholds money in violation of this provision will reimburse the party or its Affiliate whose money is withheld for the reasonable costs to collect the withheld money, notwithstanding the provisions of Subparagraph 10.a.  These costs include, but are not limited to, mediation and arbitration fees, court costs, lawyers' fees, management preparation time, witness fees, and travel expenses incurred by the party or its Affiliate, or its agents or representatives.

REORDER 905 · U.S. PATENT NO. 5538290, 5575508, 5641183, 5785353, 599436

DOCTORS ASSOCIATES INC.

To:   AMERICAN DISPUTE RESOLUTION CENTER, INC.      AMERI025

Check Number:          1228693
Date:                  10/31/2008

| Invoice Number | Date | Description | Amount | Discount | Paid Amount |
|---|---|---|---|---|---|
| S41704 | October 28, 2008 | FILING FEE | $ 950.00 | $ .00 | $ 950.00 |



| | TOTALS: | $ 950.00 | $ .00 | $ 950.00 |
|---|---|---|---|---|

THIS CHECK IS VOID WITHOUT A COLORED BORDER AND BACKGROUND PLUS A KNIGHT & FINGERPRINT WATERMARK ON THE BACK - HOLD AT ANGLE TO VIEW

**DOCTORS ASSOCIATES INC.**
325 BIC DRIVE
MILFORD, CT 06461



**CITY NATIONAL BANK OF FLORIDA**
350 EAST LAS OLAS BLVD.
FT. LAUDERDALE, FL 33301
63-436660          BR1

1228693

**DATE**          10/31/2008

PAY   Nine Hundred Fifty Dollars And 00 Cents

**AMOUNT**        $ 950.00

VOID

TWO SIGNATURES REQUIRED FOR AMOUNTS OVER $1,000

VOID AFTER SIX MONTHS

TO THE
ORDER
OF

**AMERICAN DISPUTE RESOLUTION CENTER, INC.**

CBA LAW CENTER BUILDING
30 BANK STREET-2ND FLOOR
NEW BRITAIN, CT 06051

EXHIBIT "D"

FRANCHISE ___4804___

DATE EXECUTED ___1/19/2007___

10.0

# FRANCHISE AGREEMENT

## SUBWAY INTERNATIONAL B.V.

**with**

Dorotheos K. Mafidis

Tatiani Foteini D. Mafidi

SIBV 10/06

This Franchise Agreement (this "Agreement") is made January 19, 2005 between Subway International B.V., a Netherlands limited liability company with a principal office in Amsterdam, The Netherlands ("we" or "us"), and _____ Dorotheos K. Mafidis & Tatiani Foteini D. Mafidi _____ of _____ Greece _____ ("you"), for one (1) SUBWAY® restaurant (the "Restaurant") to be located in _____ Greece _____.

### *R E C I T A L S :*

A. Doctor's Associates Inc., a Florida, USA corporation with a principal office in Fort Lauderdale, Florida, USA ("DAI"), owns a proprietary system for establishing and operating restaurants featuring sandwiches and salads under DAI's trade name and service mark SUBWAY® (the "System"). DAI developed the System spending considerable money, time, and effort. The System includes the trademark SUBWAY®, other trademarks, trade names, service marks, commercial announcements (slogans) and related insignia (logos) DAI owns (the "Marks"). The System also includes goodwill associated with the Marks, trade dress, recipes, formulas, food preparation procedures, business methods, forms, policies, trade secrets, knowledge and techniques.

B. Subway Systems International Anstalt, a Liechtenstein establishment with a principal office in Triesenberg, Liechtenstein ("Licensor"), has a non-exclusive license under a License Agreement with DAI to use the System in countries outside the United States of America, Canada, and Australia, to establish and sublicense others to establish SUBWAY® restaurants.

C. Licensor granted a sublicense to us. We operate and franchise others to operate SUBWAY® restaurants using the System, including the Marks, we have licensed.

D. You want access to the System to establish and operate the Restaurant at a location you select and we approve. You acknowledge the System includes confidential and proprietary information which we, our Affiliates (defined below), and the development agents, franchisees and agents of us or an Affiliate, will give you to use only to establish and operate the Restaurant. An "Affiliate" means a person or entity that directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, another person or entity.

E. We have granted, and will continue to grant, access to the System to others to establish and operate SUBWAY® restaurants. Our goal is to be the number one quick service restaurant system in every market we enter and we plan to open many more outlets in all markets that we choose to develop. This Agreement does not grant you the right to own additional SUBWAY® restaurants. You acknowledge we do not have to sell you additional franchises or consent to your purchase of existing franchises.

F. You acknowledge the consideration we receive from you for granting you the sublicense to use the System consists of the Franchise Fee, the Royalty and performance of your other promises under this Agreement.

G. You acknowledge you personally received our Franchise Offering Circular and its exhibits, including this Agreement (the "Offering Circular"), at or prior to your first personal meeting with our employee, development agent, agent, or representative and at least ten (10) business days before you signed this Agreement, and you signed a Receipt for the Offering Circular. You represent that you have reached the age of majority and have the legal capacity to enter into this Agreement. You represent you carefully reviewed the Offering Circular and had enough time to consult with a lawyer, accountant, or other professional advisor, if you wanted, and you understand and agree to be bound by the terms, conditions, and obligations of this Agreement. You also represent you had full opportunity, with the help of a professional advisor if you used one, to ask us and our employees, development agents, agents, or representatives, all appropriate questions and we and our employees, development agents, agents or representatives answered all of your questions to your satisfaction, except questions on the subject of potential earnings, discussed in the following paragraph. If you did not use a professional advisor, you represent you are satisfied relying on your own education, experience, and skill in evaluating the merits of a franchise offering.

H. You acknowledge no employee, agent, or representative of ours, or of Licensor, DAI, our other Affiliates, or our development agents, made any oral, written or visual representation or projection to you of actual or potential sales, earnings, or net or gross profits. You also acknowledge no employee, agent, or representative of ours, or of Licensor, DAI, our other Affiliates, or our development agents, has made any statements that are contrary to, or different from, the information in the Offering Circular, including but not limited to any statements about advertising, marketing, media support, media penetration, training, store density, store locations, support services and assistance, or the costs to establish or operate a SUBWAY® restaurant, except for any statements you wrote in at Paragraph 16.

depend primarily on your own efforts and abilities and those of your employees, and you will have to work hard and use your best efforts to operate the Restaurant. You also acknowledge other factors beyond our or your control will affect the Restaurant's success, including but not limited to, competition, demographic patterns, consumer trends, interest rates, economic conditions, government policies, weather, local laws, rules and regulations, legal claims, inflation, labor costs, lease terms, market conditions, and other conditions which may be difficult to anticipate, assess, or even identify. You acknowledge that you are subject to all federal, state and local laws relating to the franchise business. You recognize some SUBWAY® restaurants have failed and more will fail in the future. You understand that your success will depend substantially on the location you choose. You acknowledge our approval of the location for the Restaurant does not guarantee the Restaurant's success at that location and the Restaurant may lose money or fail.

J. This Agreement does not grant you any territorial rights and we and our Affiliates have unlimited rights to compete with you and to license others to compete with you.

K. **YOU UNDERSTAND AND ACKNOWLEDGE THAT PARAGRAPH 14 OF THIS AGREEMENT AMENDS ANY EXISTING FRANCHISE AGREEMENTS YOU HAVE WITH US,** to include the following provisions of this Agreement: Subparagraph 5.b. (regarding compliance with applicable laws and Operations Manual and charge for non-compliance), Subparagraph 5.c. (regarding payment of taxes, costs and expenses, responsibility for employment practices and employees, insurance and indemnification), Subparagraph 5.e. (regarding a preauthorized account and a letter of credit), Subparagraph 5.f. (regarding reporting information electronically by personal computer based point-of-sale system, SUBWAY® Cash Card Program and other new technology initiatives, high speed broadband connection, real-time sales reporting, and acceptance of debit and credit cards), Subparagraph 5.g. (regarding record keeping), Subparagraph 5.h. (regarding charges for under-reporting), Subparagraph 5.i. (regarding payment of advertising contributions and increasing advertising percentage), Subparagraph 5.m. (regarding use of domain names), Paragraph 6 (regarding relocation), Paragraph 8 (regarding defaults and termination), Paragraph 10 (regarding dispute resolution), Subparagraph 11.f. (regarding interest and late fees), Subparagraph 11.m. (regarding no territorial rights and our unlimited right to compete), Subparagraph 11.n. (regarding compliance with anti-terrorism laws), Subparagraph 11.o. ( authorization to use personal information and to conduct an investigative background search), Paragraph 13 (regarding governing law, merger clause and continuing effect), and Paragraph 18 (regarding limitation of liability).

L. YOU UNDERSTAND AND ACKNOWLEDGE ALL DISPUTES OR CLAIMS ARISING OUT OF OR RELATING TO THIS AGREEMENT, EXCEPT FOR CERTAIN OF OUR CLAIMS DESCRIBED IN SUBPARAGRAPH 10.e., WILL BE ARBITRATED IN NEW YORK. NEW YORK. USA, UNDER PARAGRAPH 10 BELOW, IF NOT RESOLVED INFORMALLY.

*A G R E E M E N T :*

Acknowledging and agreeing to the above recitals, we and you (the "parties") further agree:

**1. FRANCHISE FEES.** When you sign this Agreement, you will pay us the Franchise Fee checked below, which we will not refund except as we specifically provide for below. [*Check one*]:

___X___ a. **Standard Fee.** $10,000 US. You will pay our standard fee for a first or additional franchise. We may refund one-half (1/2) of your Franchise Fee if you fail to achieve a passing score on the standardized test conducted during the training program as provided in Subparagraph 5.a.(2). If you sign this Agreement, including the Specific Location Rider, we may refund your Franchise Fee as provided in Subparagraph 5.a.(1) of this Agreement, as amended by the Specific Location Rider.

_____ b. **Reduced Fee.** $5,000 US. (i) You represent you are currently a SUBWAY® franchisee and all of your franchises are in substantial compliance as defined in the Operations Manual (referenced in Subparagraph 5.b.) and there are no defaults under any Franchise Agreements; *or* (ii) You are purchasing your first SUBWAY® franchise for a non-traditional location and you are an approved convenience store operator, a food service management company, or other company that provides its own food services; (and you have 50 or more locations or you have a net worth of at least $10 million as shown on an audited balance sheet); or you are a cooperative, foundation, a qualified non-profit charity, hospital, university, college, other school, or governmental agency or entity; or (iii) You are purchasing your first SUBWAY® franchise for a non-traditional location we approved to be located in a portion of an existing facility you own, lease or otherwise control under a management agreement and you are a franchisee in good standing of a nationally branded gasoline retailer. If you are purchasing a franchise for a non-traditional location under clause (ii) or clause (iii), we may disapprove the location within ninety (90) days, terminate this Agreement and refund the Franchise Fee. If any of these representations are not true (based upon the most recent prior evaluation) when the Restaurant opens, you agree to pay an additional $5,000 US. You may be eligible for a rebate on the reduced franchise fee so long as all of your franchises are in substantial compliance as defined in the Operations Manual (referenced in Subparagraph 5.b.) and there are no defaults under any

_____c.  **Extension Fee**.  $1,000 US.  You previously signed a Franchise Agreement and paid a Franchise Fee but did not open the Restaurant in the time permitted.  The original Franchise Agreement is replaced by this Agreement.

_____d.  **Satellite Fee**.  $2,500 US.  You will operate the Restaurant as a limited restaurant supported by an existing Base Restaurant, as defined in the Satellite Rider.  This Agreement for the Restaurant, including the Satellite Rider, is the separate Franchise Agreement for the satellite restaurant.  We may refund your Franchise Fee if you fail to achieve a passing score on the standardized test conducted during the training program as provided in Subparagraph 5.a.(2).  We will refund the Franchise Fee for the satellite restaurant as provided in Subparagraph 5.a(1) of this Agreement, as amended by the Satellite Rider.

_____e.  **Add On Fee**.  $7,500 US.  Individuals who are existing SUBWAY® franchisees represent their franchises are in substantial compliance with the Operations Manual and there are no defaults under any Franchise Agreements.  The Franchise Fee is the reduced Franchise Fee of $5,000 US plus an add-on fee of $2,500 US to add individuals who are not SUBWAY® franchisees.  If the representations of the existing franchisees are not true when a lease is signed, you agree to pay an additional $2,500 US.

_____f.  **School Lunch**.  $0.  A school board, school district, municipality or institutional food service provider (or its nominee), or an individual existing franchisee is signing this Agreement to establish a restaurant in a school (grades K-12).  This Agreement includes the School Lunch Rider.

_____g.  **Transfer**.  $0.  Franchise No._____ owned by _____
_____ ("Seller") was transferred to you.  (Seller may have paid a transfer fee.)  The Seller's Franchise Agreement is replaced by this Agreement.

_____h.  **Amendment or Renewal**.  $0.  This Agreement replaces and/or renews the Franchise Agreement dated
_____

**2.  ROYALTY PAYMENTS.**  You will pay us weekly a Royalty equal to eight percent (8%) of the gross sales from the Restaurant and each restaurant you operate throughout the term of this Agreement.  "Gross sales" means all sales or revenues, including catering and delivery, from your business exclusive of Sales Tax (as defined in Subparagraph 5.c.).

**3.  PERMITTED ACCESS TO THE SYSTEM AND MARKS.**  We grant to you during the term of this Agreement:

a.  Continued access to the System, including the loan of a copy of the Operations Manual.

b.  Continued access to information pertaining to new developments, improvements, techniques and processes in the System.

c.  A limited, non-exclusive sublicense to use the Marks in connection with the operation of the Restaurant at one (1) location at a site we and you approved.

**4.  OUR OBLIGATIONS.**  We will provide you during the term of this Agreement:

a.  A training program, at a location we choose, for establishing and operating a restaurant using the System.  You will pay all transportation, lodging, and other expenses to attend the training program.

b.  A representative or development agent of ours to call on during our representative's or development agent's normal business hours for consultation concerning the operation of the Restaurant.

c.  A program of assistance, including periodic consultations with our representative or development agent in a location we choose; an electronic newsletter advising of new developments and techniques in the System; and access during their normal business hours to specified office personnel you may call for consultations concerning the operation of the Restaurant.

**5.  YOUR OBLIGATIONS.**  You agree to do the following:

a.  In regards to the opening of the Restaurant:

3

extension fee of $1,000 US; and iii) sign our then current franchise agreement.

(2) Before opening, you must successfully complete the training program we provide under Subparagraph 4.a. You may be dismissed from the training program and this Agreement may be terminated if you fail to act in a professional manner at all times during the training program in accordance with our Code of Business Conduct. Your Franchise Fee will not be refunded. You may be required to achieve a passing score on the standardized test conducted during the training program. If you fail to achieve a passing score, you will have the option to take one final retest. If you fail to achieve a passing score on the final retest or you opt not to take the final retest, we may dismiss you from the training program, cancel this Agreement and refund one-half (1/2) of your Franchise Fee. If more than one individual signs this Agreement, any one of the individuals who does not achieve a passing score on the test may be dismissed from the training program, removed from this Agreement and no portion of the Franchise Fee will be refunded. We will not reimburse you for your travel expenses.

(3) The Restaurant will be at a location found by you and approved by us. We or an Affiliate we designate will lease the premises and enter into a Sublease or in limited circumstances a license for the Restaurant ("Sublease") with you. We or our designee will attempt to secure a fair rent for the premises but we cannot represent it will be the best available rent for the area. If you materially breach this Agreement or the lease, we or our designee may cancel the Sublease with you or exercise rights in the lease after giving the notice required in the Sublease or lease.

(4) We may authorize you to sign a lease directly with the landlord. To assure that the location remains a SUBWAY® restaurant during the term of this Agreement you must submit the lease for our approval and you must provide us with an Assignable Interest in the lease by signing either: i) a conditional assignment of the lease; ii) an option, in our favor, for the lease; or iii) any other security interest for the lease permitted in your country. The Assignable Interest will be in a form satisfactory to us and will grant us or our designee the right to take possession of the premises and to assume the lease if you breach either the lease or this Agreement. We or our designee will not have any obligations under the lease unless we or our designee take possession of the premises under the Assignable Interest. You must give us original signed copies of: i) the lease; ii) the Assignable Interest; and iii) the landlord's consent to the Assignable Interest. If you own the location or if you have a lease directly with the landlord as we may permit, and you materially breach this Agreement or the lease, then at our sole option, your rights in the lease will be assigned to us or our designee under the Assignable Interest of the lease and we may take possession of the premises. The Assignable Interest will be enforceable against you, any corporation you establish to lease the premises for the Restaurant, and any person or entity to which the lease for the Restaurant is transferred.

(5) You will construct, equip, and open the Restaurant to the specifications contained in the Operations Manual.

b. In regards to applicable laws and the Operations Manual:

(1) You will operate your business in compliance with all existing and future applicable laws and governmental regulations, including, but not limited to, those concerning labor, taxes, health, and safety. You will be required to pay all fees associated with such compliance. You agree to obtain and keep in force, at your expense, any permits, licenses, registrations, certifications or other consents required for leasing, constructing, or operating the Restaurant. You will register any documents that must be registered, which may include this Agreement, a trademark user agreement, the primary lease, and the Sublease. You will pay all related registration fees, taxes, and preparation costs for the filing, except to the extent limited by law. Upon request, you will forward to us copies of any documentation relating to these items.

(2) You will operate the Restaurant in accordance with the Operations Manual we have licensed (the "Operations Manual"), which contains mandatory and suggested specifications, standards and operating procedures, which may be updated from time to time as a result of experience, or changes in the law or marketplace. You will make, at your sole expense, changes necessary to conform to the Operations Manual, including, but not limited to, repairing items not in good condition or not functioning properly, and upgrading and remodeling the Restaurant, including leasehold improvements, furniture, fixtures, equipment, and signs. You acknowledge these requirements are necessary and reasonable to preserve the identity, reputation, and goodwill we developed and the value of the franchise. You agree to make the repairs and the updates, and pay all reasonably required costs within reasonable time periods we establish. You will adhere to quality control standards we prescribe in the Operations Manual or elsewhere with respect to the character or quality of the products you will sell or the services you will perform in association with the Marks. You may be required

4

Case 3:10-cr-00119-PCD Document 1 Filed 02/17/10 Page 19 of 41

(3) If you fail to operate the Restaurant in accordance with the Operations Manual, we may terminate this Agreement under Subparagraphs 8.a., 8.b. and 8.c., as applicable. If we file a demand for arbitration in accordance with Paragraph 19 for your failure to comply with the Operations Manual, you will pay us, if permitted by local law, an amount equal to two percent (2%) of gross sales of the Restaurant until: i) the arbitration is disposed of by mutual agreement with us; or ii) you are evicted from the Restaurant premises; or iii) you prevail in arbitration, in which case such charges will be refunded. The monies derived from this charge will cover the costs for enforcement of our compliance standards, administrative expenses and damages to the Marks and goodwill associated with the System.

c. You will be solely responsible for all costs of building and operating the Restaurant, including, but not limited to, sales or use tax, goods and services tax, Value Added Tax, gross receipts tax, excise tax or other similar tax ("Sales Tax"), other taxes, fees, customs, stamp duty, other duties, governmental registrations, construction costs and permits, equipment, furniture, fixtures, signs, advertising, insurance, food products, labor, utilities, and rent. We will not have any liability for these costs and you will reimburse us for any such costs that we must pay in connection with your operation of the Restaurant. You will pay any Sales Tax imposed by law on the Franchise Fee, Royalty, advertising fees, and any other amounts payable under this Agreement, whether assessed on you or on us. If we must make the payment to the taxing jurisdiction for any Sales Tax that is your responsibility under this Agreement, we will pass the amount on to you and you will reimburse us. You must register to collect and pay the Value Added Tax and other Sales Taxes before you open the Restaurant, and you must maintain these registrations during the term of this Agreement. You will recruit, hire, train, terminate, and supervise all Restaurant employees, set pay rates, and pay all wages and related amounts, including any employment benefits, unemployment insurance, withholding taxes or other sums, and we will not have any responsibility for these matters.

The insurance you must obtain and maintain includes, but is not limited to, statutory worker's compensation in the minimum amount required by law, comprehensive liability insurance, including products liability coverage, in the minimum amount of $2,000,000 US, and business vehicle coverage, including owned vehicle liability, hired and non-owned vehicle liability coverage, in the minimum amount of $1,000,000 US. You must provide us with a copy of your Certificate of Insurance when you return your signed Sublease or finalize your lease. You will keep all insurance policies in force for the mutual benefit of the parties. With the exception of worker's compensation and owned vehicle coverage, all insurance policies must name as additional insureds, us, Licensor, DAI, our other Affiliates, our Development Agent assigned to the Restaurant (the "Development Agent"), and our agents, representatives, shareholders, partners, directors, officers and employees, and those of Licensor, DAI, our other Affiliates, and the Development Agent (the "Additional Insureds"), with such coverage being primary coverage. Your insurance company must agree to give us at least twenty (20) days' prior written notice of termination, expiration, material modification, or cancellation of your policy or cancellation of any of the Additional Insured as an Additional Insured. You agree to defend, indemnify, and save harmless, the Additional Insureds, from and against all liability, injury, loss, cost and expense of any type (including lawyers' fees), and damages that arise in or in connection with your operation of the Restaurant, regardless of cause or any fault or negligence (including sole or concurrent negligence) by the Additional Insureds, which indemnification will not be relieved by any insurance you carry. You acknowledge we may modify or increase the insurance requirements during the term of this Agreement due to changes in experience, and you agree to comply with the new requirements. You acknowledge we may from time to time designate one or more approved insurance brokers or companies under a master insurance program we establish for franchisees generally, and if we do, you must purchase your coverage from one of the approved insurance brokers and their associated company.

d. You will not own or operate, or assist another person to own or operate, any other business anywhere, directly or indirectly, during the term of this Agreement, which is identical with or similar to the business reasonably contemplated by this Agreement, except as our authorized representative or as our duly licensed franchisee at a location we approve. You agree to pay us $10,000 US for each business operating in violation of this Subparagraph, plus eight percent (8%) of its gross sales, as being a reasonable pre-estimate of the damages we will suffer. We may also seek to enjoin your activities under Subparagraph 10.e.

e. You will sign and deliver to us appropriate electronic funds transfer preauthorized draft forms (or forms serving the same purpose) for the Restaurant's checking account before you open the Restaurant. By signing these forms, you authorize us to withdraw money from the account on a timely basis to collect the appropriate Royalty, advertising contributions, interest, late fees, and other charges that you will owe, under this Agreement or under any other Franchise Agreement you have with us. If this form of payment is not available in your area, we may bill these charges to your credit card. If neither electronic funds nor credit cards are available in your area, you will establish an irrevocable standby letter of credit in the amount of $20,000 US for our benefit and the benefit of the Franchisee advertising fund. In certain circumstances, you will also authorize us to withdraw money for fees that we paid to a third party on your behalf in connection with the Restaurant.

5

within two (2) days after the end of the business week (currently Tuesday). You will submit weekly summaries showing results of the Restaurant's operations by the following Saturday, in writing or in electronic form as we permit, to locations we designate. You agree to use and maintain at the Restaurant a personal computer based point-of-sale system and software compatible with our requirements. You agree to install additions, substitutions, and upgrades to the hardware, software, and other items to maintain full operational efficiency and to keep pace with changing technology and updates to our requirements. You will record all sales and designated business information in your system in the manner we specify in the Operations Manual. You will report your information to us electronically as we specify and we may call up or poll your system to retrieve the information at any time. We may estimate gross sales if you fail to report on time. We may withdraw money from your checking account or bill your credit card for Royalty and advertising contributions under the above Subparagraph, for the amounts then due based on reported or estimated sales. We will adjust charges based on estimated gross sales after we determine actual sales.

You will use and maintain an email address to send and receive electronic mail and attachments on the Internet. You may be required to invest in and implement new technology initiatives, which may include but will not be limited to the SUBWAY® Cash Card Program, LCD or plasma monitors, music, internet TV broadcast, WIFI and Software Management applications, surveillance system, remote ordering through kiosks, PC's or hand held devices, E-learning, and software applications designed to better manage business functions and control costs. You will be responsible for all fees associated with these new technology initiatives. You may be required to use a supplier we designate for any goods and services associated with these initiatives, if permitted by local law. In the future, you will be required to: i) connect the Restaurant to the Internet through a high-speed broadband connection that meets our standards and specifications; and (ii) report all transactions of the Restaurant to us electronically at the same time each transaction occurs. You may be required to accept credit or debit cards from customers. You may also be required to obtain a report of all credit and debit transactions and may have to provide us with a copy of this report.

g. You shall keep full, complete and accurate books and accounts with respect to the Restaurant, in accordance with generally accepted accounting principles and all requirements of law and in the form and manner prescribed below or as further prescribed by us from time to time. Such records shall be created exclusively for the Restaurant and shall be separate and apart from records kept for any other business in which you have an interest. You will allow our representatives and the Development Agent and the Development Agent's representatives to enter your business premises without prior notice during regular business hours to inspect, audit, photocopy, and videotape your business operations and records, and to interview the Restaurant's employees and customers. Instead of or in addition to the foregoing, you will, upon our written request, make photocopies of all records we request and forward them to us or our representatives at such address as we designate in writing. We will reimburse you for the reasonable cost of photocopying documents that we request. You agree that we shall have the right to examine your books, records and electronic data; and to perform such audits, inspections, tests and other analyses as we deem appropriate to verify gross sales. You will keep all of the following at the Restaurant and for the current year and for the immediate past three (3) years: cash register tapes, control sheets, weekly inventory sheets, deposit slips, business and personal bank statements and canceled checks, sales and purchase records, business and personal tax returns, cash receipts journals, cash disbursements journals, payroll registers, general ledgers, semi-annual balance sheets, profit and loss statements, accounting records, and such other records and information as we may request from time to time. You also grant us permission to examine without prior notice to you, all records of any supplier relating to your purchases, and you hereby authorize such suppliers to release your purchase records to us at such times and places as we request.

h. In regards to under-reporting of gross sales:

(1) You will pay us, if we or our representatives determine that you under-reported gross sales, all Royalty, advertising contributions and other charges due on the gross sales that were not reported, plus interest and the late fee as provided in Subparagraph 11.f. We may estimate your gross sales to determine whether you under-reported gross sales. If reported gross sales for any calendar year are less than ninety-eight percent (98%) of the actual gross sales for that period, you will reimburse us for all costs of the investigation, including salaries, outside accountant fees, outside attorneys' fees, travel, meals, and lodging. You agree to pay for all costs of any audit that did not occur due to your failure to produce your books and records at the time of audit if we notified you in writing of the audit at least five (5) days before the scheduled date. If you fail to submit all of your information to be audited, we may estimate your sales and charge you.

(2) If reported gross sales for any calendar year are less than ninety-five percent (95%) of the actual gross sales for that period, you must also pay us a charge equal to one hundred percent (100%) of the amount of Royalty, advertising contributions and other charges due on the gross sales that were not reported, if permitted by local law. This charge covers the damages we suffer for your

diligently used our control systems each week and that your under-reporting was due solely to employee theft that could not be detected with our control systems.

i.     You will pay us, three and one-half percent (3 ½%) of gross sales of the Restaurant on a weekly basis until the franchisees in your country approve a permanent increase of the advertising percentage to four and one-half percent (4 ½ %) by a two thirds (2/3) vote on the basis of one (1) vote for each operating restaurant. We will deposit that money into the Subway Franchisee Advertising Fund Trust ("SFAFT"), provided that SFAFT: (a) follows a Transparency Policy that we approve and fully discloses all material financial data about the fund to franchisees; (b) is prudent with expenses; and (c) works closely with us to produce and place advertising to enhance the SUBWAY® brand. If SFAFT does not adhere to the above requirements, we may deposit your advertising contributions into an advertising fund established for the benefit of franchisees in the System that follows those requirements and is managed by elected franchisees. Signing this Agreement is your vote for the Restaurant, and under Paragraph 14, for all SUBWAY® restaurants you own, to permanently increase the advertising percentage to four and one-half percent (4 ½%). The permanent increase will become effective either on January 1, 2008, or once the franchisees approve the increase by a two-thirds (2/3) vote. At any time, franchisees may increase the advertising percentage for the country or any local market designated by the advertising fund temporarily or permanently by a two-thirds (2/3) vote on the basis of one (1) vote for each operating restaurant.

We and our Affiliates or another entity that we designate may negotiate additional advertising contributions and programs with suppliers. We or our Affiliate may designate that these advertising contributions shall be forwarded to a fund to be spent on advertising and related expenses for the benefit of franchisees at our or our Affiliate's complete unrestricted discretion. You acknowledge advertising contributions may not benefit franchisees in any area in proportion to the amounts they paid.

j.     You will not place "For Sale" or similar signs at or in the general vicinity of the Restaurant or use any words in any advertising that identify the business offered for sale as a SUBWAY® restaurant.

k.     You will make prompt payment of all charges you owe to us, our Affiliates, your vendors, and the landlord of the premises, in addition to Royalty and Franchisee advertising fund contributions, and pay all Sales Tax, other taxes, and debts of the Restaurant as they become due.

l.     You will research the laws, building codes, restaurant and equipment rules, and business regulations to be certain that this Agreement and all other agreements entered into regarding this franchise are legal and binding in your jurisdiction. You acknowledge we do not know these matters for every market or every country. You will defend, indemnify, and save us, Licensor and DAI harmless if any portion of this Agreement is illegal. You acknowledge we do not know the market conditions in every market or what types of locations will work best or even if the Restaurant can succeed in the market you select. You agree you must research the market conditions to determine if the Restaurant is likely to be successful in your market and to find a suitable location and negotiate a lease for the location. You acknowledge any help from us to find a location or negotiate the lease, and our approval of the site, do not guarantee success and the Restaurant may lose money or fail.

m.     You will always indicate your status as an independent franchised operator to others and on any document or information released by you in connection with the Restaurant. You will locate sources for the required food and equipment to operate the Restaurant in compliance with this Agreement and the Operations Manual. You acknowledge you may experience significant difficulty in doing so in your market.

n.     You will use or display the Marks on materials and stationery used in connection with the Restaurant only as we permit and as provided in this Agreement or in the Operations Manual. You will display the following notice, in your local language, in a prominent place at the Restaurant: *"The SUBWAY® trademarks are owned by Doctor's Associates Inc. and the independent franchised operator of this restaurant is a licensed user of such trademarks."*

o.     You will operate and promote the Restaurant under the name SUBWAY® or other name we direct without prefix or suffix added to the name. You will not use the word "SUBWAY" as part of a corporate or other business name. You will not license or purchase vehicles, fixtures, products, supplies or equipment, or incur any obligations except in your individual, corporate or other business name. Any sign face bearing the name SUBWAY® will remain our property even though you may have paid a third party to make the sign face. You will not establish a local domain name for a website using the word "SUBWAY" without our prior written authorization. The domain name must be registered under the name of SIBV or its designee. We will require you to cancel your registration of the domain name if you fail to obtain our prior written authorization. At our request, you must remove any inappropriate information we deem not to be in the best interest of the SUBWAY® franchise system. All present or future goodwill associated with the Marks belongs to DAI. You agree not to contest the validity or ownership of any of the Marks, or to assist any other person to do so. You agree you do not have and you will not acquire any

the Marks in this Agreement include any additional or replacement Marks associated with the System that we authorize you to use.

Case 3:10-cv-00119-PCD    Document 1    Filed 01/27/10    Page 22 of 41

p.  You acknowledge the System includes confidential and proprietary information, including, but not limited to customer lists, vendor lists, products, recipes, formulas, specifications, food preparation procedures, devices, techniques, plans, business methods and strategies, organizational structure, financial information, marketing and development plans and strategies, advertising programs, creative materials, media schedules, business forms, drawings, blueprints, reproductions, data, Franchise Agreements, business information related to franchisees, pricing policies, trademarks, published materials including the mark SUBWAY® and variations thereof, documents, letters or other paper work, trade secrets, know-how, information contained in the Operations Manual, and the *Subway to Subway* publication, and all information we or our Affiliates designate as confidential ("Confidential Information").  Confidential Information will remain our property or our Affiliate's property.

During the term of this Agreement you will not, without the express written consent of our board of directors, disclose, publish, or divulge any Confidential Information to any person, firm, corporation or other entity, or use any Confidential Information, directly or indirectly, for your own benefit or the benefit of any person, firm, corporation or other entity, other than for our benefit.  You agree that you will only disclose such Confidential Information to those employees that need such Confidential Information in the course of their duties and shall only reveal or transmit the Confidential Information to them after advising them that the Confidential Information has been made available to you subject to this Agreement and they agree to be bound by the confidentiality terms of this Agreement.  You acknowledge that if you violate this provision, substantial injury could result to us, our Affiliates, you and other SUBWAY® franchisees.  If you violate this provision, you will be liable to us for our damages and we may also seek to enjoin your activities under Subparagraph 10.e.  You will return all written Confidential Information, including all reproductions and copies thereof promptly upon our request. In the event that you are requested or required (by oral interrogatories, requests for information or documents in legal proceedings, subpoena, civil investigative demand or similar process) to disclose any part of Confidential Information, you shall provide us with prompt written notice of any such request or requirement so that we may seek a protective order or other appropriate remedy and/or waive compliance with the provisions of this Subparagraph.  If in the absence of a protective order or other remedy or waiver, you are legally compelled to disclose Confidential Information to any tribunal or else stand liable for contempt or suffer other censure or penalty, you may, without liability hereunder, disclose to such tribunal only that portion of Confidential Information which your legal counsel advises that you are legally required to disclose.

Confidential Information shall not include, and the foregoing restrictions shall not apply to, any information or materials (a) which becomes generally known to the public other than as a result of a disclosure by you or your representative; (b) which was disclosed to you in written form, provided that you did not have reason to believe that the source of the information may have been bound by a nondisclosure agreement with other contractual, legal or fiduciary obligations of confidentiality to us or any other party with respect to such information or materials; (c) becomes available to you on a non-confidential basis from a source other than us, provided that such source is not bound by a nondisclosure agreement with other contractual, legal or fiduciary obligations of confidentiality to us or any other party with respect to such information or materials; or (d) which is independently developed by Recipient without the use of Confidential Information. The burden of proving that Confidential Information may be disclosed pursuant to the exception set forth in this subparagraph shall be on the Recipient.

**6.  RELOCATION OF THE RESTAURANT.**  You may relocate the Restaurant only with our prior written approval.  You will have one (1) year to relocate the Restaurant and you will pay all expenses and liabilities to terminate the lease and move.

**7.  TERM OF AGREEMENT.** If, under local law, this Agreement must be registered then it will not become effective until it is. The term of this Agreement is twenty (20) years from the date of this Agreement and will automatically renew for additional twenty (20) year periods unless either party chooses not to renew and sends written notice to the other at least six (6) months before the expiration of any twenty (20) year period. Upon renewal you have the option to either: i) continue under the terms of this Agreement and the royalty rate will increase to ten percent (10%) with all other terms and conditions of this Agreement remaining the same, or ii) you may sign our then current Franchise Agreement which will replace this Agreement and which may contain terms or conditions that differ from this Agreement, including financial terms, except for the royalty rate which will remain at eight percent (8%).  This Agreement will be automatically renewed under option i) unless you send written notice of your intent to renew under option ii) at least six (6) months prior to expiration of this Agreement.  There will be no renewal fee.

8

a.  If we give you ten (10) days' written notice, we may, at our option and without prejudice to any of our other rights or remedies provided under this Agreement, terminate this Agreement effective immediately upon the expiration of the ten (10) day period, if i) you abandon the Restaurant or (ii) you fail to pay any money you owe us, our Affiliates, the Franchisee advertising fund, the landlord of the premises under the Sublease or a direct lease, or any amounts we may become liable to pay because of your action or omission, or (iii) you are evicted from the Restaurant location for non-payment of rent or related charges, or (iv) you fail to register and maintain your registration to collect and pay the Value Added Tax and all other Sales Taxes.  The notice will specify the default and provide you ten (10) days to remedy the default from the date of delivery of the notice.

b.  If we give you ninety (90) days' written notice, we may, at our option and without prejudice to any of our other rights or remedies provided under this Agreement, terminate this Agreement effective immediately upon the expiration of the ninety (90) day period, if you (i) do not substantially perform all of the terms and conditions of this Agreement not otherwise covered in Subparagraph 8.a., or (ii) you lose possession of the premises where the Restaurant is located, or (iii) you become insolvent, make an assignment for the benefit of creditors or seek bankruptcy relief, either reorganization or liquidation, in any court, legal or equitable, or (iv) you lose any permit or license which you need to operate the Restaurant, or (v) you fail to comply with your duties under this Agreement or the Operations Manual, or (vi) if you use the Restaurant or the Restaurant location for any unauthorized use that we believe is injurious or prejudicial to the System, the Marks or the goodwill associated therewith. The notice will specify the default and provide you sixty (60) days to remedy the default from the date of delivery of the notice. If you cure the default within sixty (60) days, the notice will be void.

c.  We may, at our option and without prejudice to any of our other rights or remedies provided under this Agreement, terminate this Agreement without an opportunity to remedy the default unless prohibited by law if i) you fail to comply with all civil and criminal laws, ordinances, rules, regulations and orders of public authorities, or ii) intentionally under-report gross sales, falsify financial data or otherwise commit an act of fraud, or iii] you are convicted or plead guilty or "nolo contendere" to a felony, a crime of moral turpitude, an indictable offense, unfair or deceptive trade practices , or any other crime or offense that we believe is injurious or prejudicial to the System, the Marks or the goodwill associated therewith, or iv] if you use the Restaurant or the Restaurant location for any illegal use, or v) we are prohibited from doing business with you under any anti-terrorism law, including but not limited to the USA PATRIOT Act or Executive Order 13224 enacted by the United States Government and any such laws applicable in your country, or vi) you are dismissed from the training program.

After the second notice of a default under Subparagraph 8.a. or 8.b., any subsequent default in the following twelve (12) month period will be good cause for a final termination without providing you an opportunity to remedy the default or even if you remedy the default.

d.  Our rights to notify you of a default and to terminate this Agreement are not affected by the notification and arbitration procedures under Paragraph 10.  If we terminate this Agreement and you dispute the termination, you must file a demand for arbitration as provided in Subparagraph 10.g. in order to seek reinstatement.  We may enforce the termination by filing for arbitration and then court confirmation of the arbitration award without first seeking informal discussions.

e.  Upon termination or expiration of this Agreement, all of your rights under this Agreement will terminate. You must change the appearance of the Restaurant, unless we instruct you otherwise, so it will no longer be identified as a SUBWAY® restaurant, and you must stop using the System, including the Marks, signs, colors, structures, personal computer based point-of-sale system software developed for SUBWAY® restaurants, printed goods and forms of advertising indicative of our sandwich business and return the Operations Manual to us. We will be authorized to cancel the registration of any Trademark User Agreement, and you agree to sign any documents necessary to cancel the registration.  You are required to cancel any permits, licenses, registrations, certifications or other consents required for leasing, constructing, or operating the Restaurant.  If you fail to do so within a reasonable time, we are authorized to cancel them for you.  Any costs for cancellation will be borne by you. If you breach this provision, you will pay us $250 per day for each day you are in default, as being a reasonable pre-estimate of the damages we will suffer.  We may also seek to enjoin your activities under Subparagraph 10.e.

f.  If any of the provisions above which permit us to terminate the franchise violate applicable local law, local law relating to termination will prevail over the offending provisions.

g.  For three (3) years after the termination, expiration or transfer of this Agreement, you will not directly or indirectly engage in, or assist another to engage in, any sandwich business within three (3) miles or five (5) kilometers of any location where a SUBWAY® restaurant operates or operated in the prior year, if permitted by local law.  You agree to pay us $10,000 for each sandwich business location you are associated with in the restricted area in violation of this Subparagraph, plus eight percent (8%) of the gross sales of such location during the three (3) year period, as being a reasonable pre-estimate of the damages we will suffer.  We may also seek to enjoin your

9

Case 3:15-cv-00197-D Document 1 Filed 12/7/15 Page 2 of 41

h. Upon termination, expiration or transfer of this Agreement, you agree to remain bound by the provisions of confidentiality and non-disclosure under Subparagraph 5.p. of this Agreement. You acknowledge that all Confidential Information will remain our property or our Affiliate's property. You will not at any time after termination, expiration or transfer of this Agreement, without our prior written consent, disclose to any unauthorized person or entity, or use for the benefit of any unauthorized person or entity, any Confidential Information.

i. If you breach any other agreement with us, at our option it will also be a breach of this Agreement.

j. Upon termination or expiration of this Agreement, all telephone listings, telephone numbers, Internet addresses and domain names used by the public to communicate with the Restaurant will automatically become our property if permitted by local law. In any event, you agree not to use any telephone numbers, Internet addresses or domain names associated with the Restaurant after the termination or expiration of this Agreement.

k. We have the right to repurchase the Restaurant within thirty (30) days of termination or expiration of this Agreement at fair market value minus any money you owe us, our affiliates or the landlord. If we do not purchase the Restaurant, you are responsible for obtaining a termination and mutual release of the lease from the landlord of the premises on which the Restaurant is located. You are responsible for all costs associated with obtaining the termination and mutual release, including but not limited to any amount owed to the landlord.

## 9. TRANSFER AND ASSIGNMENT OF THE RESTAURANT.

a. You may only transfer the Restaurant with this Agreement and only with our prior written approval, as provided in this Paragraph 9. You may transfer the Restaurant and this Agreement to a natural person or persons (not a corporation), provided:  (1) you first offer, in writing, to sell the Restaurant to us on the same terms and conditions offered by a bona fide third party purchaser, we fail to accept the offer within thirty (30) days, and we approve your contract with the purchaser ; (2) each purchaser has a satisfactory credit rating, and is of good moral character; (3) each purchaser, if required, received a passing score on the standardized test (if not already a SUBWAY® franchisee);  (4) each purchaser attended and successfully completed our training program or agrees to attend our training program promptly after the sale (and then must successfully complete the training program or will be in default under the Franchise Agreement); (5) each purchaser received the required disclosure documents in accordance with our policies and national and local laws, rules, and regulations, and signs the then current form of Franchise Agreement which will amend and replace this Agreement and may contain terms that differ from this Agreement, including financial terms, and assumes the Sublease for the Restaurant; (6) you pay in full all money you owe us, our Affiliates, and the Franchisee advertising fund, for all your SUBWAY® restaurants and you are not otherwise in default under this Agreement; (7) you pay us $5,000 US (plus any applicable Sales Tax) for our legal, accounting, training, and other expenses we incur in connection with the transfer; (8) you transfer the Operations Manual for the Restaurant to the purchaser on the date of transfer; (9) you deliver a general release in favor of us, the Development Agent and our Affiliates, and agents, representatives, shareholders, partners, directors, officers and employees of ours and of the Development Agent and our Affiliates, signed by you and each purchaser; and (10) at or prior to the time of the transfer you bring the Restaurant into full compliance with our then current standards set forth in the Operations Manual. All transfer documents will be in English in a form satisfactory to us. During the transfer process, we may share your personal information with its affiliates or prospective franchisees in accordance with the procedures set forth in our Privacy Policy. If you do not want your information shared during the transfer process, you must opt out either prior to the completion of the store transfer or at the time of the transfer. All opt out requests should be directed to the Privacy Officer, as set forth in our Privacy Policy.

b. You may assign your rights under this Agreement to operate the Restaurant (but not this Agreement) to a corporation (or similar entity) provided: (1) the corporation is newly organized and its activities are confined exclusively to operating the Restaurant; (2) you are, and remain at all times, the owner of the controlling voting interest and majority ownership interest (more than 50%) of the corporation; (3) each individual who signs this Agreement owns no less than twenty-five percent (25%) of the corporation, unless we allow otherwise pursuant to your written request;  (4) the corporation delivers to us a written assumption of your obligations under this Agreement; (5) all shareholders of the corporation deliver to us a written guarantee of the full and prompt payment and performance by the corporation of all its obligations to us under the assignment; (6) you acknowledge to us in writing that you are not relieved of any personal liability; and (7) you deliver a general release described in Subparagraph 9.a., signed by you, the corporation, and each shareholder of the corporation.  You will also remain personally liable under the Sublease. You acknowledge that any judgment awarded in our favor, pursuant to this Agreement, may be enforced against you, the corporation and its successors or assigns.

10

transferee must then successfully complete our training program or will be in default under this Agreement. The transferees will also assume the Sublease in writing.

d. We may transfer and assign this Agreement without your consent, and this Agreement will inure to the benefit of our successors and assigns. You consent that any of our Affiliates or their designees may succeed to our interests or the interests of our designee in the Sublease or the lease under the Assignable Interest.

**10. DISPUTE RESOLUTION.** The parties want to settle all issues quickly, amicably, and in the most cost effective fashion. To accomplish these goals, the parties agree to the following provisions that will apply to resolve any dispute or claim arising out of or relating to this Agreement, or any other Franchise Agreement the parties have with each other (a "Dispute"):

a. The parties agree to first notify each other in writing of any Dispute. The written notification will specify, to the fullest extent possible, the notifying party's version of facts and all elements of the Dispute. You agree to use your best efforts to communicate with us, including the Ombudsmen Department, and the recognized franchisee owners representative organization, to attempt to resolve the Dispute. If the parties do not resolve the Dispute within thirty (30) days after receipt of the notice of the Dispute, we or you may commence arbitration as provided in this Paragraph 10. Each party will be responsible for its own costs, including lawyers' fees, in any arbitration or court proceeding, except as otherwise provided in this Paragraph 10.

b. The parties agree that except as otherwise provided in this Agreement, the arbitration procedures will apply to all Disputes, including the breach of this Agreement and any alleged precontractual representations or conduct, applicable national and local franchise disclosure or franchise relationship laws, unfair trade practice laws, or similar laws.

c. The parties will arbitrate any Dispute the parties do not settle under the discussion procedures above, and any Dispute which this Agreement provides will be submitted directly to arbitration, except as provided in this Agreement. The arbitration will be held in accordance with the United Nations Commission on International Trade Regulations and Law (UNCITRAL) Arbitration Rules administered by an arbitration agency, such as the International Centre for Dispute Resolution, an affiliate of the American Arbitration Association, at a hearing to be held in New York, New York, USA. The arbitration will be conducted in English and decided by a single arbitrator unless the law of the country where the Restaurant is located requires three (3) arbitrators. Any court having jurisdiction may enter judgment on the arbitrator's award. Except as provided in this Agreement, a party must commence and pursue arbitration to resolve Disputes before commencing legal action. We will honor validly served subpoenas, warrants and court orders.

d. If a court of competent jurisdiction decides the requirement to arbitrate a Dispute is unenforceable because applicable law does not permit the type of claim involved to be resolved by arbitration, or because this Agreement limits a party's rights or remedies in a manner applicable law does not permit, or for any other reasons, then under Subparagraph 11.c., the entire arbitration clause is not void. Only the portions of the arbitration clause with respect to such claim or claims as are necessary to comply with applicable law will be invalid and considered severable, but the remainder will be enforced.

e. You recognize if you breach the provisions of this Agreement that prohibit you from infringing intellectual property rights in the Marks or in copyrighted items, or from disclosing Confidential Information, or from competing, you may cause irreparable harm to us, our Affiliates, other franchisees, and the System as a whole. We or an Affiliate may bring an action in any court having jurisdiction, in accordance with the laws of that jurisdiction, in connection with any such breach, and may seek damages, injunctive relief, or both. Notwithstanding any other provision of this Agreement, if a breach specified in this Subparagraph 10.e. occurs, both parties agree that due to the likelihood of such breach causing immediate and irreparable harm we do not have to provide you with written notice of such breach before seeking any damages, injunctive relief or both and that this Agreement may be terminated by us immediately. Notwithstanding any other provision of this Agreement, the arbitration procedures above, and the monetary limitation on damages in Paragraph 18 below, will not apply to any such breach.

f. You agree the only person or entity from which you may seek damages or any remedy for any Dispute, including the breach of this Agreement, is us, or our successor or assign. You agree you will not name our shareholders, directors, officers, employees, or agents, or Licensor, DAI, our other Affiliates, or the Development Agent, or the shareholders, directors, officers, employees, agents, or partners of Licensor, DAI, our other Affiliates, or the Development Agent, in any arbitration or legal action. You agree none of these other entities or individuals will be liable to you; only we will. You acknowledge we have relied on this representation in signing this Agreement.

terminate this Agreement without first giving notice of a Dispute or pursuing arbitration. You may dispute the termination by filing a demand for arbitration within thirty (30) days after the effective date of the termination, without first giving notice of a Dispute. You may only demand a Declaratory Judgment in the arbitration to determine if the termination was invalid and only request an award reinstating this Agreement. The arbitrator may only rule on the validity of the termination and the award may only grant or deny the request for reinstatement. You will waive the remedy of reinstatement if you do not file for arbitration within the time allowed. We may file a demand for arbitration requesting validation of the termination of this Agreement and appropriate relief and may seek court confirmation of any arbitration award without first giving notice of a Dispute.

h. If a party: (i) commences action in any court, except to compel arbitration, or except as specifically permitted under this Agreement, prior to an arbitrator's final decision, or (ii) commences any arbitration or litigation in any forum except where permitted under this Paragraph 10, then that party is in default of this Agreement. The defaulting party must commence arbitration (or litigation, if permitted under this Paragraph 10), in a permitted forum prior to any award or final judgment. The defaulting party will be responsible for all expenses incurred by the other party, including lawyers' fees. If a party defaults under any other provision of this Paragraph 10, or under any provision of Paragraph 18, including, but not limited to, making a claim for special, incidental, consequential, punitive, or multiple damages, or damages in excess of the amount permitted under this Agreement, or you name a person or entity in any arbitration, or legal proceeding other than us, the defaulting party must correct its claim. The defaulting party will be responsible for all expenses incurred by the other party, or the improperly named persons or entities, including lawyers' fees, and will be liable for abuse of process.

i. Any settlement or arbitration award will have a binding effect only on the actual Dispute arbitrated, and will not have any collateral effect on any other Dispute whatsoever, whether in litigation, arbitration, or other dispute resolution proceeding. You will arbitrate or litigate each Dispute with us on an individual basis. You will not consolidate your Dispute in any arbitration or litigation action, with a claim by any other franchisee, individual, or entity.

j. If a court of competent jurisdiction decides the arbitration clause in Subparagraph 10.c. is unenforceable, and after any and all final appeals the decision is upheld, the parties agree to litigate a Dispute in the United States District Court for the District of Connecticut, USA. In the event that the arbitration clause is held unenforceable and the parties are subject to litigation in a local court of competent jurisdiction, local law shall apply. The parties waive any right to trial by jury, except where waiver is prohibited by applicable law.

k. The parties submit to the jurisdiction of any tribunal or court in accordance with Subparagraph 10.c. and Subparagraph 10.j., for arbitration or litigation of any Dispute, and waive any right to object to the location being inconvenient. Such jurisdiction will be exclusive, except for our right or our Affiliates' rights under Subparagraph 10.e. to bring an action in any court having jurisdiction, to protect intellectual property rights in the Marks, copyrighted items, and Confidential Information, or to enforce the covenants not to compete.

l. We or you must start the action permitted under this Paragraph 10 to resolve a Dispute, whether by giving notice of the Dispute or filing for arbitration, litigation, or any other permitted proceeding, within one (1) year from the time the events occurred which give rise to the Dispute, or the claim will be barred, except we may bring a claim under Subparagraph 5.h. for under-reported sales within five (5) years from the under-reporting or the maximum time period allowed by law for up to five (5) years. We or you may bring an action for indemnification within one (1) year after we or you have notice of the claim that gives rise to the indemnification action. The parties recognize this Subparagraph may have shorter time limits than applicable law will permit.

m. Our waiver of any of your defaults will not constitute a waiver of any other default and will not prevent us from requiring you to strictly comply with this Agreement.

n. The sublessor, whether us or our designee, may evict you from the Restaurant if you breach the Sublease. If local law allows, we or our designee may evict you if you breach a direct lease with the landlord if we or our designee exercise the rights under the Assignable Interest of lease. The provisions of this Paragraph 10, regarding Disputes, do not apply to our actions or our designee's actions to enforce the terms of the Sublease or the lease under this Agreement, and we or our designee do not have to give notice of the dispute or claim or file an arbitration to enforce rights under the Sublease.

o. We and our Affiliates, and you and your Affiliates, will not withhold any money due to the other party and its Affiliates, under this Agreement or any other agreement. A party or its Affiliate that withholds money in violation of this provision will reimburse the party or its Affiliate whose money is withheld for the reasonable costs to collect the withheld money, notwithstanding the provisions of Subparagraph 10.a. These costs include, but are not limited to, mediation and arbitration fees, court costs, lawyers' fees, management preparation time, witness fees, and travel expenses incurred by the party or its Affiliate, or its agents or representatives.

12

**11. OBLIGATION OF THE PARTIES.** The parties also agree as follows:

a. You are, and will at all times be identified as, a natural person and an independent contractor. You are not our agent, partner, or employee. This Agreement does not create a partnership, joint venture, agency, or fiduciary relationship.

b. All or any part of your rights and privileges under this Agreement will return to us if for any reason you abandon, surrender, or suffer revocation of your rights and privileges.

c. If, for any reason, any court, agency, or tribunal with valid jurisdiction in a proceeding to which we are a party, decides in a final, non-appealable ruling, that a portion of this Agreement is contrary to, or in conflict with any applicable present or future law, rule, or regulation, after giving such portion the broadest legal interpretation possible, then that portion will be invalid and severable. The remainder of this Agreement will not be affected and will continue to be given full force and effect if removing the invalid portion does not change the intent of this Agreement. Any invalid portion will be deemed not to be a part of this Agreement as of the date the ruling becomes final if you are a party to the proceedings, or upon your receipt of notice of nonenforcement from us. If removing the invalid portion does change the intent of this Agreement, the parties agree to amend that portion to conform to applicable law and keep the intent of this Agreement. If the parties cannot amend this Agreement to maintain the intent, we may, at our option, cancel this Agreement immediately without any obligation or prejudice to our other rights or remedies. If the parties discover this Agreement was invalid at the time it was signed, we may, at our option, declare this Agreement null and void by giving you thirty (30) days' notice. If a court, agency, or tribunal decides a covenant not to compete is too broad as to scope, time, or geographic area, the parties authorize the court, agency or tribunal to modify the covenant to the extent necessary to make it enforceable.

d. No previous course of dealing or usage in the trade not specifically set forth in this Agreement will be admissible to explain, modify, or contradict this Agreement.

e. The parties will give any notice required under this Agreement in writing, and will send it by a mail service which uses a tracking system that provides evidence of the date the notice is received, such as DHL Worldwide Express or Federal Express. We will address notices to you at the Restaurant or at your home address until you designate a different address by written notice to us. You must notify us of any address changes, including changes to your electronic mail address. You will address notices to us to Subway International B.V., Prinsengracht 13, 1015 DK, Amsterdam, The Netherlands, until we designate a different address by written notice to you. We and you will send required copies of all notices to the Attention of the Legal Department, Doctor's Associates Inc., 325 Bic Drive, Milford, CT 06461 USA. Any notice will be deemed given at the date and time it is received, or refused, or delivery is made impossible by the intended recipient.

f. If your payment is more than one (1) week late you will pay a late fee equal to ten percent (10%) (or the maximum rate allowed by law, if lower) on any Royalty, advertising contributions, or other charges you will owe us under this Agreement. Also, you will pay interest on all your past-due accounts at the maximum rate allowed by law in the jurisdiction in which our principal office is located or the Restaurant is located, whichever is higher.

g. You must immediately notify us of any infringement of or challenge to your use of any of the Marks, or claim by any person of any rights in any of the Marks. We will indemnify you for all damages for which you are held liable in any proceeding arising out of the use of any of the Marks in compliance with this Agreement, provided you notify us promptly, cooperate in the defense of the claim, and allow us or our Affiliate to control the defense of the action. In some countries, we are aware of prior registrations of the trademark SUBWAY and third parties owning trademarks that may supersede our use of the Marks, which are disclosed in Item 13 of the Offering Circular. We cannot guarantee that you will have the right to use the Marks in these countries, or that you will not have to share use of the trademark SUBWAY with third parties in these countries. If a third party challenges any of the Marks claiming infringement of alleged prior or superior rights in the Mark, we will have the option and right to modify or discontinue use of the Mark and adopt substitute Marks in your geographical business areas and in other areas we select. Our liability to you under such circumstances will be limited to your cost to replace signs and store advertising materials. You acknowledge and agree we and our Affiliates have the exclusive right to pursue any trademark infringement claims against third parties. You waive the benefit of any applicable local law granting you enforcement rights.

h. If we terminate this Agreement and we must purchase the Restaurant's equipment, leasehold improvements, or both, under any applicable local law, rule, regulation, or court decision, the purchase price will be the original cost, less depreciation and amortization, based on a five (5) year life under the straight-line method.

i. If the landlord terminates the lease for the Restaurant and an arbitrator or court determines you did not breach the Sublease and it was our fault or our Affiliate's fault the landlord terminated the lease, our obligation to you will be limited to the original cost of your leasehold improvements, less depreciation based on a five (5) year life under the straight-line method. We will pay you when you reopen the Restaurant in a new location. If the

arbitrator or court determines you breached the Sublease or it was not our fault or our Affiliate's fault the landlord terminated the lease, we and our Affiliate will have no obligation to you for termination of the lease.

Case 3:20-cv-08130-RCJ   Document 1   Filed 01/27/10   Page 28 of 41

j. If you believe that we are in default under this Agreement, you must give us written notice within ninety (90) days of the start of the default clearly stating each act or omission constituting the default. If we do not cure the default to your satisfaction within sixty (60) days after we receive your notice, you may give us notice a Dispute exists. The parties will work diligently to attempt to resolve the Dispute. If the parties do not resolve the Dispute within thirty (30) days, the parties may follow the procedures to start arbitration under Paragraph 10. Any default contained in your notice will be considered cured if you do not file for arbitration.

k. You may be required by law to withhold taxes on all payments to us. If you are required to withhold such taxes, upon signing this Agreement, you will provide us documentation containing the tax rates. We and you will cooperate to furnish documents the taxing authorities require to establish the applicable withholding tax rate. You will pay all taxes you withhold to the appropriate authorities and send us a tax certificate or other evidence confirming payment. Each of the parties will notify the other within thirty (30) days after receiving notice of any audit or other inquiry from the taxing authorities about payments made to us under this Agreement. The parties will cooperate in responding to such audit or other inquiry. You will pay us Sales Tax or other tax assessed on all payments you make to us that we must collect from you or pay ourselves to the taxing authority. You will hold us harmless and/or reimburse us for any tax liability, interest or penalties we incur due to your failure to withhold taxes required by law.

l. You will pay us any applicable Sales Tax on behalf of the local taxing authority at the same time and in the same manner you pay for the taxable goods or services, whether or not the requirement is specifically stated in this Agreement.

m. You understand and acknowledge this Agreement does not grant you any territorial rights and there are no radius restrictions or minimum population requirements which limit where we can license or open another SUBWAY® restaurant, unless provided under local law. We and our Affiliates have unlimited rights to compete with you and to license others to compete with you. You understand and acknowledge we and our Affiliates retain the exclusive unrestricted right to produce, distribute, and sell food products, beverages, and other products, under the SUBWAY® mark or any other mark, directly and indirectly, through employees, representatives, licensees, assigns, agents, and others, at wholesale, retail, and otherwise, at any location, without restriction by any right you may have, and without regard to the location of any SUBWAY® restaurant, and these other stores or methods of distribution may compete with the Restaurant and may adversely affect your sales. You do not have any right to exclude, control or impose conditions on the location or development of any SUBWAY® restaurant, other restaurant, store or other method of distribution, under the SUBWAY® mark or any other mark.

n. You acknowledge it is our intent to comply with anti-terrorism laws, including but not limited to the USA PATRIOT Act and Executive Order 13224 enacted by the United States Government and any such laws applicable in your country. You further acknowledge that we will not carry on business with anyone suspected as a terrorist or anyone otherwise associated directly or indirectly with terrorist activities. The parties agree that if, at any time during the term of this Agreement, we are prohibited from doing business with you under any anti-terrorism law applicable in your country or enacted by the US Government, then this Agreement may be terminated immediately in accordance with Subparagraph 8.c. You acknowledge that you are not now, and have never been a suspected terrorist or otherwise associated directly or indirectly with terrorist activity, including but not limited to, the contribution of funds to a terrorist organization. You further acknowledge that it is not your intent or purpose to purchase a SUBWAY® franchise to fund or participate in terrorist activities.

o. You authorize us, at any time during the term of this agreement, to conduct credit checks or investigative background search, on you which may reveal information about your business experience, educational background, criminal record, civil judgments, property ownership, liens, association with other individuals, creditworthiness and job performance.

**12. TERMS, LANGUAGE, REFERENCES AND HEADINGS.** All terms and words in this Agreement will be deemed to include the correct number, singular or plural, and the correct gender, masculine, feminine or neuter, as the context or sense of this Agreement may require. This Agreement is in the English language, which language will control in all respects. No translation, if any, of this Agreement into any other language, will be given any force or effect to interpret this Agreement, unless required by the law of the country in which the Restaurant is located. Each individual signing this Agreement as the franchisee will be jointly and severally liable. References to "you" will include all such individuals collectively and individually. References to dollars ($) in this Agreement refer to the lawful money of the United States of America. The paragraph headings do not form part of this Agreement and shall not be taken into account in its construction or interpretation.

**13. GOVERNING LAW.** This Agreement will be governed by and construed in accordance with the substantive laws of Liechtenstein, without reference to its conflicts of law, except as may otherwise be provided in

14

this Agreement. The parties acknowledge Licensor is located in Liechtenstein, and Licensor wants to achieve consistency in the ~~interpretation and enforcement of this agreement throughout world.~~ You acknowledge that to accomplish Licensor's goal, Licensor directs that we chose Liechtenstein law to govern our Franchise Agreements unless local law requires us to use local law. This Agreement, including the Recitals and all exhibits, contains the entire understanding of the parties and supersedes any prior written or oral understandings or agreements of the parties relating to the subject matter of this Agreement. The parties may not amend this Agreement orally, but only by a written agreement, except we and our Affiliates may amend the Operations Manual from time to time as provided in this Agreement. The provisions of this Agreement which by their terms are intended to survive the termination or expiration of this Agreement, including, but not limited to, Subparagraphs 5.c., 5.h., 5.k., 5.p., 8.d., 8.e., 8.g., 8.h., 11.b., 11.h., 11.i., and 11.m., and Paragraphs 10, 13, 14, 15, 16, 17, 18 and 20, will survive the termination or expiration of this Agreement.

**14. AMENDMENT TO PRIOR AGREEMENTS.** The parties want to encourage advertising cooperation and franchisee compliance, provide for amicable, timely, and cost effective resolution of Disputes with limitations on liability, and clarify certain provisions of existing Franchise Agreements. To achieve these goals, this Agreement has revised provisions regarding payment of taxes, costs and expenses, responsibility for employment practices and employees, insurance, indemnification, preauthorized account and letter of credit, reporting information electronically by personal computer based point-of-sale system, payments due following an audit, increasing advertising contributions, defaults and termination, dispute resolution, interest and late fees, no territorial rights and our unlimited right to compete, governing law, merger clause, continuing effect, and limitation of liability. You agree to accept the provisions set forth in Subparagraph 5.b., Subparagraph 5.c., Subparagraph 5.e., Subparagraph 5.f., Subparagraph 5.g., Subparagraph 5.h., Subparagraph 5.i., Subparagraph 5.o., Paragraph 6, Paragraph 8, Paragraph 10, Subparagraph 11.f., Subparagraph 11.m., Subparagraph 11.n., Subparagraph 11.o., Paragraph 13, and Paragraph 18 in this Agreement, for this Agreement and to the amendment of all your other existing Franchise Agreements with us to include these provisions (if the existing Franchise Agreements do not already include these provisions). **EACH OF YOU SIGNING THIS AGREEMENT AS FRANCHISEE ACKNOWLEDGES AND UNDERSTANDS THAT THIS PARAGRAPH 14 AMENDS ALL YOUR EXISTING FRANCHISE AGREEMENTS WITH US, AND ANY SUCH AMENDMENT WILL SURVIVE THE TERMINATION OR EXPIRATION OF THIS AGREEMENT.** This Paragraph 14 amends any existing Franchise Agreement you have if every individual who signed the existing Franchise Agreement as franchisee signs this Agreement or another Franchise Agreement containing the provisions of this Paragraph 14.

**15. RESPONSIBILITY FOR TRANSLATIONS.** We and our Affiliates conduct business in English (as spoken in the United States of America). All communication and business between us and you will be in English, including, but not limited to, training programs, training materials, correspondence, contracts, transfer documents, sales literature, manuals, newsletters, specifications, reports, notices, and arbitration. Specifications, weights, and measures, are in the English Measure System. If we do not have a Development Agent assigned to the Restaurant, you will research local laws to determine if this Agreement and any related documents must be in the local language, or must use local specifications, weights, and measures. If local law requires, or if you feel it is necessary you, at your sole cost, will obtain accurate translations of documents or conversions of specifications, weights, and measures, and provide copies to us. You will be responsible for the accuracy of any translation or conversion. If any portion of a translation or a conversion is not correct, that is, not identical in meaning to the English text or not equivalent to the English Measure System specification, weight, or measure, you will obtain a correction immediately. If we have already obtained translations, conversions, or corrections, you will reimburse us for our expenses. The parties will sign English language versions of this Agreement and any related documents, in addition to any translations. Unless otherwise required by local law, the English version will control.

**16. NO OTHER REPRESENTATIONS.** You acknowledge no employee, agent, or representative of ours, or of Licensor, DAI, our other Affiliates, or our development agents, has made any representations to you, and you have not relied on any representations, except for the representations contained in this Agreement, the Offering Circular, and our advertising materials, and except those you have written in below:

_____

_____

_____

_____

_____

**17. NO PRIOR CLAIMS AND GENERAL RELEASE.** You represent that as of the date of this Agreement, you have no claims of any type against us, Licensor, DAI, our other Affiliates, or the Development Agent, or our agents, representatives, shareholders, directors, officers, and employees, or those of Licensor, DAI, our other Affiliates, and the Development Agent, except those you have written in below:

_____

You hereby release each of these individuals and entities from all claims other than those you listed above. You acknowledge and understand that any list of claims and the general release will include any alleged breaches of franchise or other laws, and any alleged breach of agreement, relating not only to this Agreement, but also to any agreements or dealings you may have or had at any time with us or any of the above listed individuals or entities.

**18. LIMITATIONS ON DAMAGES.**

a. The parties agree no party will be liable for special, incidental, consequential, or punitive damages, and no party will seek multiple forms of damages of any kind in any Dispute, except to the extent national or local law prohibits this limitation of damages or this Agreement otherwise permits. Each party's liability will be limited to compensatory damages, including claims for actual damages or losses and for lost future earnings or profits. Any claim for lost future earnings or profits will be limited to a maximum period of one (1) year. The parties specifically agree the provisions of this Subparagraph 18.a. will apply even if applicable governing law or arbitration rule permits an award for the type of damages the parties agree will not be available under this Agreement.

b. The parties further agree that a party's total liability for Disputes, as limited in Subparagraph 18.a., is further limited to an amount not greater than (1) $80,000 US, as adjusted annually for inflation in the country in which our principal office is located, at the end of each full calendar year as reported by official government sources if available, otherwise by any reasonably reliable source, or (2) the minimum amount in controversy necessary for federal diversity jurisdiction under 28 United States Code Section 1332; whichever yields the larger amount.

**19. CONSENT TO TERMS OF AGREEMENT.** You acknowledge you read and understand this Agreement, including any addenda and exhibits (including, but not limited to, any local language translations of Paragraphs 10, 11, and 18 we provided), and you agree to be bound by all of its terms and conditions.

**IN WITNESS WHEREOF,** the parties have executed this Agreement, as of the date first written above.

FRANCHISEE(S):                                SUBWAY INTERNATIONAL B.V.

_____                       By:_____
        Franchisee

_____                       Title:_____
        Franchisee

_____
        Franchisee

SIBV 10/06

16

## ADR CENTER
### Commercial Arbitration Tribunal

In the Matter of the Arbitration between

Re: 26-0557-08 L

    **Subway International BV**      **(Claimant)**
    **and**
    **Dorotheos K. Mafidis &**
       **Tatiani Foteini D. Mafidi**    **(jointly and severally, Respondent)**
    **Subway Store #41704**

## AWARD OF ARBITRATOR

I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement entered into between the above-named parties and dated January 19, 2007 having been duly sworn, and the oral hearings having been waived, and having fully considered all the documents submitted to me pursuant to the UNCITRAL Arbitration Rules, FIND and AWARD, as follows:

1. The Franchise Agreement executed between CLAIMANT and RESPONDENT dated January 19, 2007 (the "Agreement") has been breached by RESPONDENT.

2. The Agreement and Respondent's rights to operate thereunder are terminated as of February 6, 2009.

3. CLAIMANT is awarded the sum of 21,012.61 EUROS representing royalties in the amount of 14,642.13 EUROS, advertising fees in the amount of 6,370.48 EUROS and related charges owed to CLAIMANT by RESPONDENT in accordance with the Agreement.

4. The RESPONDENT must disidentify the SUBWAY® store and cease and desist use of all trade names, trademarks, service marks, signs, colors, structures, printed goods and forms of advertising indicative of the CLAIMANT's sandwich business and return the Operations Manual to the CLAIMANT as required by Paragraph 8 e of the Agreement. Without prejudice to any of CLAIMANT's other possible rights, in accordance with the terms of the Agreement, if RESPONDENT fails to comply with these requirements, RESPONDENT shall pay CLAIMANT the sum of Two Hundred Fifty Dollars and No Cents ($250.00USD) per calendar day that the non-compliance persists from February 6, 2009 forward.

5. The RESPONDENT must comply with the following conditions contained in Paragraph 8 g of the Agreement: The RESPONDENT shall not directly engage in or assist another to engage in, any sandwich business other than a duly licensed SUBWAY® restaurant on the premises in which their franchise operated for a period of one year from February 6, 2009. If RESPONDENT fails to comply with these requirements, RESPONDENT shall pay CLAIMANT the sum of Ten Thousand Dollars and No Cents ($10,000.00USD) for each sandwich business they are associated with PLUS Eight Percent (8%) of the gross sales of each such business during the one (1) year period.

6. This Award is in full settlement of all claims and counterclaims submitted to this Arbitration.  All claims not expressly granted herein are hereby denied.

The fees and expenses of the ADR Center totaling $950.00 USD and the compensation of the arbitrator totaling $850.00 USD shall be borne entirely by RESPONDENT.  Therefore, RESPONDENT shall pay to CLAIMANT the sum of $1,750.00 USD in addition to all other sums required to be paid by RESPONDENT by this Award, for that portion of said fees, expenses and compensation previously advanced to the ADR Center by CLAIMANT.

_2/6/09_
Date
Springfield, Massachusetts USA

Paul Peter Nicolai

I, Paul Peter Nicolai, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is my Award.

_2/6/09_
Date

Paul Peter Nicolai

COMMONWEALTH OF MASSACHUSETTS
COUNTY OF HAMPDEN, ss:

On this 6th day of February, 2009, before me, the undersigned notary public, personally appeared Paul Peter Nicolai, proved to me through satisfactory evidence of identification, which was a photograph carry driving license, to be the person whose name is signed on the preceding document, and acknowledge to me that he signed it voluntarily for its stated purpose.

Carol A. Hebert, Notary Public

My commission expires _February 20, 2009_

EXHIBIT "G"

## ΑΝΤΖΗ ΙΩΑΝΝΑ ΜΑΝΩΛΗ

| | |
|---|---|
| **Από:** | "dorotheos mafidis" <mafdoros@yahoo.gr> |
| **Προς:** | <ajmanoli@otenet.gr> |
| **Αποστολή:** | Παρασκευή, 2 Οκτωβρίου 2009 9:01 πμ |
| **Θέμα:** | Fw: 41704 |

Αυτο ειναι το mail που εστειλα σε απαντηση του προηγουμενου στις 28/8
--- Στις **Παρ., 28/08/09,** ο/η dorotheos mafidis *<mafdoros@yahoo.gr>* έγραψε:

Από: dorotheos mafidis <mafdoros@yahoo.gr>
Θέμα: 41704
Προς: mafdoros@yahoo.gr
Ημερομηνία: Παρασκευή, 28 Αύγουστος 2009, 12:32

Dear Lee,
We received two days ago the below email concerning our store (#41704).
Could you please inform us explicitly about that, and send me all the relevant documents?
I also think that we should be informed why did the hearing take place without anyone letting us know, by
email or mail, when you have both our addresses.
The fact that you have proceed to this action without us knowing and reached a decision, which we found out
by chance after sending the attached letter below, makes us really sceptical about your intentions and purposes.
Waiting for your answer.
Regards,
Tatiana Mafidi
Doros Mafidis

Χρησιμοποιείτε Yahoo!
Βαρεθήκατε τα ενοχλητικά μηνύ ματα (spam); Το Yahoo! Mail διαθέτει την καλύτερη δυνατή
προστασία κατά των ενοχλητικών μηνυμάτων

---

Χρησιμοποιείτε Yahoo!;
Βαρεθήκατε τα ενοχλητικά μηνύματα (spam); Το Yahoo! Mail διαθέτει την καλύτερη δυνατή
προστασία κατά των ενοχλητικών μηνυμάτων
http://mail.yahoo.gr

No virus found in this incoming message.
Checked by AVG - www.avg.com
Version: 8.5.420 / Virus Database: 270.14.3/2409 - Release Date: 10/02/09 06:46:00



# ADR CENTER
AMERICAN DISPUTE RESOLUTION CENTER

CBA Law Center
30 Bank Street
New Britain, CT 06051
Telephone: (860) 832-8060
Fax: (860) 223-1846
www.adrcenter.net

# FAX

Number of Pages: _____
(Including Cover Sheet)

Date: ___3/10/09_____

To: _____   Fax: _____

To: ____Fran Piotrowski_____   Fax: _____

To: _____   Fax: _____

Cc: _____   Fax: _____

From: __Laura McNaughton_____   Fax: ___(860)-223-1846___

Re: ___Subway Int'l BV vs Mafidis (Store #41704) – Case #26-557-08L___

☐ Urgent  ☐ For Review  ☐ Reply  ☐ Please Comment  ☐ Please Recycle

Comments:

Fran...as we discussed on the phone, I received the Registered Letter I sent respondent dated 2/12/09 with the award and it was returned to our office but I don't know why because the reason is in Greek and the post office couldn't even help me decipher it. You requested I fax the award to you, you then would email it to the Respondents for proof of receipt. The award is enclosed. Call me if you have any questions.

February 12, 2009

Tricia Lee, Esq.
Subway International, B.V.
325 Bic Drive
Milford, CT 06461

Dorotheos K. Mafidis          (Via First Class & Registered Mail)
Tatiani Foteini D. Mafidi
Subway
Syghrou 22 Kaleshroy 1
Athens, GRE 10563

Re: 26-0557-08 L
    Subway International, B.V.
    and
    Dorotheos K. Mafidis & Tatiani Foteini D. Mafidi (Store # 41704)

To the Parties:

In accordance with the Rules, and by direction of the Arbitrator, the hearings are declared closed and enclosed for the parties is the duly executed Arbitration Award, signed by Arbitrator Nicolai for the above entitled matter.

If you have any questions, please do not hesitate to contact me.



Very truly yours,

Laura McNaughton
Case Manager



ADR CENTER

AMERICAN DISPUTE RESOLUTION CENTER

CBA Law Center
30 Bank Street - 3rd Floor
New Britain, CT 06051

Dorotheos K. Mafidis
Tatiani Foteini D. Mafidi
Subway
Syghrou 22 Kallesheroy 1
Athens, GRE 11742

RETURN RECEIPT REQUESTED

UNITED STATES
POSTAL SERVICE®

PAR AVION
AIRMAIL

Label 20 U, January 2001

12793

20-2

REGISTERED MAIL

RB 831 088 225 US

5-7-08



Español | Customer Support | FedEx Locations   Search                    Go

Package/Envelope      Freight      Expedited      Office/Print Services

Ship ›          Track ›        Manage ›      Business Solutions ›

# Detailed Results

Printable Ve

Enter tracking number

| Detailed Results | Notifications |
|---|---|

**Tracking no.: 977071076930**                                      ✉

**Delivered**

Initiated     Picked up     In transit     Delivered

**Delivered**
Signed for by:  M.AFIDIS

**Shipment Dates**                              **Destination**

Ship date ⑦   Feb 4, 2009                     ATHENS GR
Delivery date ⑦   Feb 10, 2009 9:31 AM        Proof of Delivery ⑦

## Shipment Facts

| Service type | International Priority Service | Reference | 61000-361-00000 |
|---|---|---|---|

## Shipment Travel History

Select time zone:  Select                                          Select time

All shipment travel activity is displayed in local time for the location

| Date/Time | Activity | Location | Details |
|---|---|---|---|
| Feb 10, 2009 9:31 AM | Delivered | ATHENS GR | |

Global Home | Small Business Center | Service Info | About FedEx | Investor Relations | Careers | fedex.com Terms of Use | Security & Priv
This site is protected by copyright and trademark laws under US and International law. All rights reserved.© 1995– 2010 FedE:



## SUBWAY INTERNATIONAL BV • Prinsengracht 13,
## 1015 DK, Amsterdam, The Netherlands

February 4, 2009
VIA Fed-Ex
977071076930

Dorotheos K. Mafidis
Tatiani Foteini D. Mafidi
Subway®Store#41704
Kaleshroy 1 Syghrou 22
Athens, Greece   10563

RE: ARBITRATION: SIBV V: Dorotheos K. Mafidis and Tatiani Foteini D. Mafidi
Subway® Store #41704 - Kaleshroy 1 Syghrou 22   Athens, GRE   10563

**CASE# 26-0557-08 L**

Dear Dorotheos K. Mafidis and Tatiani Foteini D. Mafidi;

Enclosed please find the evidence package the Claimant intends to present via submission of documents for a
hearing scheduled for Wednesday, February 4, 2009.   The Claimant reserves the right to submit additional
evidence as needed for rebuttal.  Arbitrator: Paul P. Nicolai, Esq.

Sincerely,

Tricia Lee
Attorney
Legal Department
Lee_T@subway.com

TL/ /fcp
Enclosures

cc:  ADRC via Fed-Ex – 977071076920 – (Attn:  Laura McNaughton - Case Mgr.)

# INTRODUCTION

Subway International B.V., the Claimant (herein SIBV), a Netherlands limited liability corporation, acts as a franchisor for the SUBWAY® sandwich shops in the Netherlands under a licensing agreement with its affiliate, Doctor's Associates Inc.. Doctor's Associates Inc. owns the trade name and service mark Subway®, recipes, formulas, food preparation procedures, business methods, business forms and business policies.  SIBV also has a service contract with Doctor's Associates Inc.  As part of the service contracting arrangement, Doctors Associates Inc. provides certain service, including legal services on behalf of SIBV.

On January 19, 2007, the Respondents, Dorotheos K. Mafidis and Tatiani Foteini D. Mafidi (herein "Respondents"), executed Subway® Franchise Agreement #41704 with SIBV. (SIBV Exhibit 2). On June 20, 2007, the Respondents opened Subway® Store# 41704 located at Syghrou 22 Kaleshroy 1 Athens Greece 10563. (SIBV Exhibit 3).

The Agreement requires the Respondents pay to SIBV, via electronic funds transfer, a weekly Royalty of 8% and weekly Advertising fees of 4.5%.  These are percentages of weekly sales after sales tax. (SIBV Exhibit 2, paragraphs 2 and 5i). These amounts are calculated from the weekly sales figures provided by the Respondents.  The Respondents are obligated to use the "POS" system, which is an application contained within the Respondents' Cash Register that electronically mails the Respondents' sales information each week to SIBV. (SIBV Exhibit 2, paragraph 5f).  The Respondents must send in written back up called the Weekly Inventory and Sales Report (WISR) by Saturday of the following week. (SIBV Exhibit 2, Paragraph 5f). Explanation and instructions concerning the WISRS are found in the Operations Manual. (SIBV Exhibit 8, Chapter 2).

The Agreement provides that SIBV may charge interest on all past due amounts. (SIBV Exhibit 2, paragraph 11f.). The Agreement also provides that SIBV shall be reimbursed by the Respondents for all costs incurred in the collection of delinquent amounts due SIBV by the Respondents. (SIBV Exhibit 2, paragraph 10.o.).

# MONETARY ISSUES

The Respondents have breached the Franchise Agreement by failing to pay the required Royalty and Advertising fees. (SIBV Exhibit 2, paragraphs 2, 5i, and Affidavit of Dylan Nicholson).

Under the terms of the Franchise Agreement (SIBV Exhibit 2), the Franchisee is required to open a direct debit account, when it is available in the country where the store is located, and give SIBV authorization to electronically draft the weekly royalty, advertising and miscellaneous invoices from that account. The Respondents opened their account on the February 6, 2007. However, they never funded or provided the required authority to the bank for SIBV to obtain the royalties and advertising fees from that account. (SIBV Exhibit 4 and Affidavit of Dylan Nicholson).

When the Respondents' accounts first became delinquent, the Respondents were contacted concerning the delinquencies, in accordance with the Collection Department policy and procedure. (Affidavit of Dylan Nicholson).  After failing to obtain the money due by this method, a notice of default for non-payment of royalty and advertising fees was mailed to the

Respondents on July 8, 2008, as required by the Franchise Agreement, paragraph 8a. (SIBV Exhibit 2, Exhibit 7 a. and Affidavit of Dylan Nicholson). This notice, sent via DHL Currier gave the Respondents 10 (ten) days in which to bring their accounts current. A notice of failure to cure the default was mailed to the Respondents on September 23, 2008. (SIBV Exhibit 7 b. and Affidavit of Dylan Nicholson). The defaults have never been cured and the Arbitration was filed on November 4, 2008. (SIBV Exhibit 1 and Affidavit of Dylan Nicholson).

Dylan Nicholson performed an analysis on the Respondents' accounts to ascertain what amounts were owed. In preparing the analysis for the royalty and advertising accounts, the quarterly sales ledger reports for Store #41704 were used. (SIBV Exhibit 5 and Affidavit of Dylan Nicholson). This report is a record of the royalty and advertising fee accounts for each 13-week period of the year. This record is available back to the date the store opened. Copies of the quarterly ledgers are sent to the Respondents each quarter. The invoices generated by SIBV for charges made against the Respondents' accounts were used in the analysis. (SIBV Exhibit 6 and Affidavit of Dylan Nicholson)

Using the quarterly ledgers, we looked for the point where the accounts first became delinquent. Each category of items appearing on the ledgers is added up. These categories include the royalty and advertising fees due, the payments recorded and each category of invoice. Using the Accounting Department records of the misc. invoices (invoice edit lists and actual invoices), it was determined what category each charge fell in; returned items, finance charges, sales corrections, purchases, etc. (SIBV Exhibit 5, Exhibit 6 and Affidavit of Dylan Nicholson). Once everything was broken down by category and totaled, the categories were added or subtracted and the results were verified to the computer balances.

The Respondents spoke to Dylan on June 2, 2008 with regards paying the amounts then due. They discussed and agreed upon a payment plan which included a down payment and weekly payments. The payment plan was mailed to the Respondents. However, the Respondents never returned the signed payment plan and the down payment agreed . After the notice of default letter was mailed to the Respondents in July 2008, they again contacted Dylan and requested another opportunity for a payment plan. The Respondents and Dylan agreed to a new schedule of payments and a new down payment. On July 15, 2008, Dylan sent another payment plan to the Respondents. However, the Respondents, again, did not return the payment plan or down payment. The Respondents did not make payments toward the delinquent balances due nor did they make any of the weekly payments due, so the delinquent balance continued to accrue. Consequently, the arbitration was filed. (SIBV Exhibit 1 and Affidavit of Dylan Nicholson).

The Respondents' Subway® Store #41704 closed on November 3, 2008 because it is a seasonal location. (SIBV Exhibit 5 and Exhibit 6 and Affidavit of Dylan Nicholson).

The Respondents have not cured the defaults. They currently owe $19,286.27 US Dollars (14,642.13-Euros) for Royalties and $8,391.05 US Dollars (6,370.48-Euros) for Advertising fees, for a total due in the amount of $27,677.32 US Dollars (21,012.61-Euros). (SIBV Exhibit 5 and Affidavit of Dylan Nicholson). **(Total due does not include Arbitrator compensation).**

## CONCLUSION

SIBV has, over many years, developed a body of knowledge concerning the operation of Subway® Stores.  It has developed, at great expense and effort, formulas, food preparation procedures, recipes, and business methods and policies, which have made it a very successful franchise enterprise.  The sole consideration paid to SIBV, by the Franchisees, for the use of its trademark, body of knowledge, polices and procedures are the weekly royalty payment of 8% of weekly sales.  The 4.5% advertising fee is paid to The Subway Franchisee Advertising Fund Trust, which is controlled by the Franchisees for advertising for the benefit of all the Franchisees.

The Respondents have violated the terms of their Franchise Agreement with the Claimant.  They have failed to pay the royalty and advertising fees due under the Agreement.  Under the terms of the Agreement, the Claimant is entitled to termination of the Franchise Agreement for Subway® Store #41704, all monies now due including all costs associated with the collection of said money due and other relief as the Claimant is entitled to under the terms of the Franchise Agreement.  The Claimant requests the Arbitrator render an award in accordance with the proposed Order annexed hereto.

Respectfully Submitted,

Tricia Lee
Attorney for the Claimant